**DON KING EQUIPMENT COMPANY and Don King, Plaintiffs–Appellants/Cross–Respondents,**

v.

**DOUBLE D TRACTOR PARTS, INC., David E. Eftink and Doris J. Eftink, Defendants–Respondents/Cross–Appellants.**

Nos. 25007, 25012.

Missouri Court of Appeals, Southern District, Division One.

July 30, 2003.

Rehearing Denied Aug. 20, 2003.

James R. Robison, Robison & Robison, Sikeston, for appellants.

Mary Eftink Boner, Buerkle, Beeson, Ludwig, Jackson & Boner, L.C., Jackson, for respondents.

PHILLIP R. GARRISON, Judge.

This case involves cross appeals from a judgment entered in a contract dispute arising from the sale of a part of the business of Don King Equipment Co. ("King Equipment") to Double D Tractor Parts, Inc. ("Double D"). We affirm in part, and reverse in part.

King Equipment, owned by Don King ("King"), was in the business of the purchase and sale of new and used farm equipment, parts and salvage. On November 1, 1995, King Equipment and King ("Sellers") entered into a contract ("the contract") for a sale of part of that business to Double D, a corporation formed by David E. Eftink ("Eftink") and his wife, Doris ("the Eftinks"). The Eftinks were also parties to that contract in that they agreed to sign a promissory note to King Equipment for a part of the purchase price. The contract stated that Double D was purchasing the assets devoted to and a part of King Equipment's farm equipment parts operation, and that King Equipment would continue the business of the purchase and sale of farm equipment consisting of whole or complete units including combines, tractors, cotton pickers, grain heads, corn heads, and their attachments. Specifically, the contract contained the following under the heading "OTHER AGREEMENTS":

28. KING EQUIPMENT'S Continued Business. It is recognized by the parties that KING EQUIPMENT shall continue to conduct operations

of a portion of its business referred to in the trade as "whole goods business", which shall be defined for the purposes hereof to mean that KING EQUIPMENT may continue to deal in the purchase and sale of new or used, complete or whole combines, tractors, cotton pickers, grain heads and corn heads, and their attachments. Such business shall not include the purchase of such whole or complete units for the purpose of salvage or salvaging parts therefrom, it being understood that the equipment parts and salvage portion of KING EQUIPMENT'S operation shall be conducted hereafter by BUYER. While the parties agree that KING EQUIPMENT shall be allowed to continue its business in the purchase and sale of whole farm equipment as defined, KING EQUIPMENT'S continued operation shall in no way extend to the purchase of insurance salvage parts or units, or to any parts or salvage operations of any kind within a one hundred fifty (150) mile radius of King Equipment's present location.

. . . .

30. *Covenant Not To Compete.* The parties recognize that the BUYER, in acquiring the assets hereunder will continue activities the same or similar to a portion of KING EQUIPMENTS' [sic] prior business. Accordingly, to protect and preserve to BUYER the salvage and parts portion of that business, the assets of which are acquired hereunder, SELLERS, as well as the other officers and directors of KING EQUIPMENT shall not for a period of five (5) years from and after the date of this agreement, directly or indirectly, . . . own, manage, operate, join in, control, or participate in the ownership, management, operation or control of any business, regardless of entity type, . . . within a one hundred fifty (150) mile radius of KING EQUIPMENT'S existing business location in Sikeston, Missouri, which in any way engages in or participates in the parts or salvage parts or salvage or insurance salvage or parts business where such parts are purchased, sold or traded.

This appeal primarily involves the meaning of the words "attachments" and "salvage" as they relate to the provisions of paragraph 28 and 30.

Sellers filed a two-count petition against Double D and the Eftinks in September 1999. Count I was for a declaratory judgment in which it was alleged that King Equipment had reserved the right to continue in the "whole goods business" as defined in the contract, and that a dispute had arisen between the parties about the extent of King Equipment's right to do so. King Equipment sought a determination that it was not in violation of the contract, and a declaration of the rights and relations of the parties arising from that document. In Count II, Sellers sought a judgment for $68,400 as a result of Double D's alleged failure to honor an agreement between the parties by which Double D subsequently purchased land from King Equipment and, as part of that sale, agreed to provide $75,000 credit to King Equipment for its use in purchasing merchandise from Double D. King Equipment alleged that after $6,600 of that credit had been used, Double D refused to honor the remainder of the credit as a result of the dispute about the interpretation of the Covenant Not to Compete contained in paragraph 30 of the contract ("Covenant Not to Compete").

Double D and the Eftinks filed a "Counter–Petition" seeking an injunction and damages for Sellers' alleged violation of the Covenant Not to Compete. The trial court entered a preliminary injunction on September 3, 1999 against Sellers enjoining them "from in any way engaging in or participating in the parts or salvage parts or salvage or insurance salvage or parts business" involving a long list of parts utilized for a "[c]orn [h]ead," "[r]ow [c]rop [b]ean [h]ead," "[g]rain [h]eads," "[c]ombines," and "[t]tractors."

The preliminary injunction was dissolved on May 24, 2002, the same day the trial court entered the judgment from which these appeals flow.[1] In its judgment the trial court concluded that there was never a meeting of the minds of the contracting parties concerning what is "salvage," or about the Covenant Not to Compete, or about King Equipment's right to continue business. Based on that finding, the court ordered that the portions of the contract relating to the Covenant Not to Compete be stricken; since King Equipment financed the sale to Double D, the promissory note from Double D was ordered reduced by $200,000, being the principal amount of the purchase price relegated to that covenant. Double D was also given a judgment "for the interest paid at the promissory note rate of eight (8%) percent [on the] said $200,000[ ] from [the date of the contract] to the date of [the judgment] in the amount of $136,370.79." The court also awarded Double D attorney fees of $16,250. With reference to the dispute about the credit for parts purchased from Double D, the court ordered Double D to abide by the terms of that agreement and to reinstate the credit to King Enterprises in the amount of $68,000. These appeals followed.[2]

Our review is pursuant to *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).[3] The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence or it erroneously declares or applies the law. *Id.* All evidence and permissible inferences favorable to the prevailing party are accepted as true; evidence and inferences to the contrary are disregarded. *B–Mall Co. v. Williamson*, 977 S.W.2d 74, 77 (Mo.App. W.D.1998).

### APPEAL BY KING EQUIPMENT AND DON KING

In one of Sellers' points on appeal, they contend that the trial court erred in holding that there was not a meeting of the minds concerning the Covenant Not to Compete based on its finding that the parties were in disagreement as to the meaning of the provision. They argue that the fact that the parties disagree as to the

---

1. A judgment was originally entered in this case on June 27, 2001, but some of the record from the trial was not able to be transcribed and this court remanded the case to the trial court for the re-taking of the excluded evidence. That was done and the new judgment was entered on May 24, 2002.

2. The briefs of both parties contain citations to the record in support of factual statements. In several instances, the statements made are not supported by the portion of the record cited. Rule 84.04(i) requires that all statements of fact and argument shall have specific page references to the legal file or the transcript. The failure to comply with that rule places a burden on the appellate court that it cannot be expected to satisfy and will, in some cases, result in denial of a point that relies on such inaccuracies. *See Lewis v. FAG Bearings Corp.*, 5 S.W.3d 579, 588 (Mo.App. S.D.1999).

3. *Murphy* interpreted the provisions of Rule 73.01(c). The provisions of that rule now appear in essentially the same form in Rule 84.13(d), Missouri Rules of Civil Procedure (2003).

meaning of a clause in the contract is not a basis for holding that the clause is invalid, and that there was evidence from which the court could have decided the meaning of the provisions. This point is well taken.

The trial court, in its judgment, quoted the provisions of the contract referred to above and noted the disagreement between the parties and their experts concerning the meaning of the term "attachments" in paragraph 28 of the contract. That provision defined "whole goods business" as meaning that King Equipment would continue to "deal in the purchase and sale of new or used, complete or whole combines, tractors, cotton pickers, grain heads and corn heads, and their attachments." The disagreement in the testimony extended to how to differentiate between "attachments" included as part of the "whole goods business" under paragraph 28, and "salvage" or "parts" referred to in paragraphs 28 and 30.

Under paragraph 28, King Equipment's continued business was not to include the "purchase of insurance salvage parts or units, or to any parts or salvage operations of any kind" within 150 miles and, under paragraph 30, Sellers were precluded from "[engaging] in or [participating] in the parts or salvage parts or salvage or insurance salvage or parts business" in which "such parts are purchased, sold or traded." The court referred to (1) testimony by King that he had intended that he would be able to continue selling all farm machinery type goods listed in a new John Deere dealers' catalog as "attachments," as well as whole goods, (2) Eftink's testimony that it was his intention that King would not sell certain specified types of items, and that "attachment" referred to tillage type equipment that is hooked behind a tractor, and (3) Eftink's testimony that King had violated the contract by, among other things, bidding on

salvage and dealing in salvage units. The court also noted that the experts of both parties could not agree on what are "parts" and what are "attachments." The trial court concluded that there never was a meeting of the minds between the parties regarding what is "salvage" in that King testified it depends upon what the property is used for when sold to the ultimate purchaser, while Eftink said that it depends upon the condition of the property at the time of purchase or how it is classified by an insurance company. The trial court found:

> Based upon the testimony of the parties, their experts, and the other witnesses as well as the exhibits presented, it is the court's finding that there never was a meeting of the minds between the parties to the [contract] regarding the terms of the [C]ovenant [N]ot to [C]ompete and King Equipment's continued business. As there is no meeting of the minds of the parties to the agreement, there is no need to determine whether the [contract] was ambiguous or interpretation [sic] of any ambiguities.

Consequently, the trial court held that the portions of the contract "relating to a covenant not to compete between the parties is hereby stricken."

A "meeting of the minds," or "mutual assent" of all parties is esse▨ to the formation of a contract. *Fiege▨ Freeman–Oak Hill Health Sys.*, 996 S.W.2d 767, 771 (Mo.App. S.D.1999). Courts of this state have held that whether there was a meeting of the minds is a question of fact for the trial court to decide. *Dickemann v. Millwood Golf & Racquet Club, Inc.*, 67 S.W.3d 724, 728 (Mo. App. S.D.2002) (citing *Silver Dollar City, Inc. v. Kitsmiller Constr. Co.*, 931 S.W.2d 909, 914 (Mo.App. S.D.1996)); *Computer Network v. Purcell Tire & Rubber*, 747 S.W.2d 669, 674 (Mo.App. E.D.1988). We

defer to the findings of fact in a court-tried case, but we make an independent evaluation of the conclusions of law the trial court draws from its factual findings. *Porter v. Falknor*, 895 S.W.2d 187, 189 (Mo.App. E.D.1995). Here, the trial court concluded, based upon the conflicting evidence about the meaning of terms used in the contract, that there had been no meeting of the minds concerning the non-competition agreement, and, therefore, it was not valid. We conclude that this was a misapplication of the law.

■■■■ If the trial court's judgment is correct, a literal application would result in there being no meeting of the minds, and thus no contract, any time parties are unable to agree upon the meaning or interpretation of a contract or its terms. Obviously, that cannot be true. In Missouri, courts look to the parties' *objective* manifestations of intent to determine whether there was a "meeting of the minds." *Fiegener* at 771. A person's subjective intent is irrelevant. *Id.* It is the actions, and not the intentions or suppositions, of the parties that determine whether or not there is a contract and the terms of the contract. *B–Mall Co.* at 78. Under the objective theory of contracts applied in Missouri since 1892, the stress is on the outward manifestation of assent made to the other party, in contrast to the older idea that a contract was a true "meeting of the minds." *Peet v. Randolph*, 33 S.W.3d 614, 618 (Mo.App. E.D.2000). It is presumed the parties' intent is expressed by the natural and ordinary meaning of the language in the contract. *Id.* Disregarding either party's secret surmise or undisclosed assumption, the court must ascertain the parties' meaning and intent as expressed in the language used and give effect to that intent. *Id.* at 618–19. *See also Paul's Rod & Bearing, Ltd. v. Kelly*, 847 S.W.2d 68, 72 (Mo.App. W.D.1991) (whether a meeting of the minds exists is determined objectively by looking at the intent of the parties as expressed by their actual words or acts).

■■■■ The Missouri Supreme Court has held that if a written instrument, on its face, expresses a contractual obligation, one of the parties should not be permitted to avoid it on the grounds that it was never intended as such unless the evidence to such effect is cogent and convincing. *Berry v. Crouse*, 376 S.W.2d 107, 113 (Mo. 1964). Thus, a meeting of the minds is necessarily implied by the existence of a contract. *B–Mall Co.* at 78. In *L.B. v. State Committee of Psychologists*, 912 S.W.2d 611, 617 (Mo.App. W.D.1995), the court said, "[t]he existence of a contract necessarily implies that there has been a 'meeting of the minds' between the parties which the court can determine by looking to the intentions of the parties as expressed or manifested in their words or acts."

In *Koelling v. Bank of Sullivan*, 220 S.W.2d 794, 798 (Mo.App.St.L.1949), the appellant contended that there was no valid contract because there had been no meeting of the minds of the parties as to some essential terms of the agreement. In rejecting the contention, the court said:

When parties to a contract use a term which subsequently gives rise to controversy as to its meaning, there is presented merely a problem of construction. Such a controversy of itself does not show that the minds of the parties did not meet upon the terms of the contract.

*Id.* This is in keeping with the statement at 17A Am.Jur.2d, *Contracts* § 30, that "the fact that an executed written contract contains within itself difficulties of construction about which the parties disagree does not enable the parties to contend that the minds of the parties never met, since by signing the writing the parties bind them-

selves to such interpretation as the court may place upon the words and symbols employed by them." To the same effect is the language found at 17 C.J.S., *Contracts* § 36, that "[t]he fact that differences subsequently arise between the parties as to the construction of the contract ... is not of itself sufficient to affect the validity of the original contract or to show that the minds of the parties did not meet with respect thereto."

In *Luebbert v. Simmons,* 98 S.W.3d 72, 78 (Mo.App. W.D.2003), the court quoted with approval from *Lucy v. Zehmer,* 196 Va. 493, 84 S.E.2d 516, 522 (1954), where the court said:

> An agreement or mutual assent is of course essential to a valid contract but the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. If his words and acts, judged by a reasonable standard, manifest an intention to agree, it is immaterial what may be the real but unexpressed state of his [or her] mind.

In *Rathbun v. Cato Corp.,* 93 S.W.3d 771, 778 (Mo.App.S.D.2002), we held that in interpreting contracts where there is a dispute as to the meaning of a term contained therein, the cardinal rule is to ascertain the intention of the parties and to give effect to that intention. We also held that if it is found that the contract is ambiguous, the court is to determine the intent of the parties. *Id.* at 779. Thus, a court can interpret ambiguous contracts. *Elliott v. Johnston,* 673 S.W.2d 807, 809 (Mo.App. E.D.1984).

Here, neither of the parties appears to have contended in the trial court that the Covenant Not to Compete was invalid because of the lack of a meeting of the minds concerning its terms. Rather, the dispute revolved around the meaning of the terms "attachments" and "salvage" utilized in the contract, and how the Covenant Not to Compete should be interpreted. In our view, this case is one for construction of the contractual terms in question. In that regard, whether the contract is ambiguous is a question of law for the trial court to decide initially.[4] *Rathbun* at 778. Here, the trial court never reached that issue, but rather, decided erroneously that it need not do so because the Covenant Not to Compete did not arise from a meeting of the minds and never constituted a contract. Its conclusion that there was never a meeting of the minds because the parties and their witnesses disagreed on the meaning of the terms "attachments" and "salvage" was a misapplication of the law. For that reason, the judgment must be reversed and the case remanded to the trial court for further proceedings.

In another of their points on appeal, Sellers contend that the trial court erred in ordering a $200,000 reduction in the principal of the debt owed by Double D and the Eftinks, and in awarding interest on that amount, based on its finding that there had been no meeting of the minds. Our discussion and resolution of the preceding point, also dictates that the portion of the judgment ordering that reduction and awarding that interest be reversed.

In their final point, Sellers contend that the trial court erred in failing to enter a judgment for them on Double D's claim for damages for breach of the non-competition agreement because of the lack of proof regarding the correct measure of damages. They argue that by holding that the non-competition clause was invalid, the

---

**4.** We also note that the mere fact that the parties disagree on the interpretation of a contract does not render the document itself ambiguous. *Garner v. Hubbs,* 17 S.W.3d 922, 927 (Mo.App. S.D.2000).

371

trial court avoided having to rule on what they describe as the more complex issue of whether Double D met its burden of proof on the issue of damages for the alleged breach of the non-compete clause. They conclude that Double D did not meet that burden, and that we should so hold and reverse the judgment outright and enter a judgment for them or, in the alternative, if we remand the case, that we should instruct the trial court on the proper method of proving damages.

As we interpret Sellers' contention, it is that regardless of whether the trial court erred in holding that the non-competition clause was invalid because of a lack of a meeting of the minds, Double D and Eftinks failed on their claim for breach of that agreement because they failed to prove any damages when viewed in the light of the established rules for proving such damages. They rely on cases such as *Brown v. McIBS, Inc.,* 722 S.W.2d 337, 341 (Mo.App. E.D.1986), where the court stated that because a multitude of variable factors can enter into the composition of damages for loss of profits, courts have been strict in their evaluation of the sufficiency of the evidence warranting their recovery. Another case relied on by Sellers is *Coonis v. Rogers,* 429 S.W.2d 709 (Mo.1968), where the court held that there are stringent requirements to sustain awards of damages for loss of business profits, and that a substantial basis for such awards is necessary and they may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount. *Id.* at 713–14.

In this case, we are not cited to any portion of the record demonstrating that this contention was submitted to the trial court. "Review is still of claimed errors on the part of the trial court which, with some exceptions, [Rule 78.07] re-

quires that the matters reviewed have been presented to the trial court." *Christ v. Tice,* 578 S.W.2d 319, 321 (Mo.App. W.D.1979). This specific issue apparently was not presented to the trial court for ruling. This, together with the fact that we do not know how the trial court may construe the disputed contractual provisions on remand, convinces us that we should not consider this point. "Obviously, the trial court never reached the issue of damages and should be given the opportunity to make findings and enter its judgment on that issue[.]" *Franke v. Southwestern Bell Telephone Co.,* 479 S.W.2d 472, 478 (Mo.1972). Sellers' suggestion that we should give the trial court instruction as to the proper method of proving damages in the form of lost profits on remand, invites us to give an advisory opinion, which we cannot do. *See Mohawk Flush Doors, Inc. v. Kabul Nursing Homes, Inc.,* 938 S.W.2d 347, 350 (Mo.App. S.D.1997). Sellers' third point is denied.

## APPEAL BY DOUBLE D AND THE EFTINKS

Double D and the Eftinks present three points of alleged trial court error, all of which relate to the portion of the judgment finding that there was an agreement between the parties whereby King Equipment was entitled to a parts credit for parts purchased from Double D, that there was $68,000 remaining on that credit, and requiring them to reinstate the credit.

When the parties entered into the contract for the purchase of the business, they also entered into a lease agreement by which King Equipment leased improved real estate to Double D. In 1997, at Mr. Eftink's request, the parties began negotiations for the sale of the property to Double D. Although King initially asked $550,000, the parties finally agreed on $450,000, with King Equipment to get a

$75,000 credit on parts purchased from Double D. According to their verbal agreement, the parts credit would extend over ten years with no more than one-half of the credit being utilized for the purchase of new parts and the remainder for used parts. During the first three years, no more than $5,000 of the credit could be utilized each year. Beginning in the fourth year, $10,000 per year could be used. The contract entered into relative to the land sale, however, contained no mention of the parts credit. There was a dispute in the testimony over why the parts credit was not mentioned in the written real estate contract. King said that Eftink wanted it omitted because he did not want the bank to know how much he was paying for the property.[5] Eftink said King did not want it in the contract, although he gave no reason for asking that it be deleted. In any event, the contract for the purchase of the land, as prepared and signed by the parties, stipulated a purchase price of $450,000, $75,000 of which was to be paid at closing, and $375,000 to be evidenced by a promissory note and deed of trust by Double D and the Eftinks to King Equipment. The contract also contained the phrase that it was "in consideration of mutual covenants and agreements contained herein and other good and valuable consideration the sufficiency of which is hereby acknowledged[.]" When that contract was closed, King Equipment conveyed the real estate by a corporate warranty deed stating that the consideration was "[t]en [d]ollars and other good and valuable consideration."

In 1999, the dispute between the parties over what business activities King Equipment could engage in under the contract

came to a head. At that time, Eftink told King that if their contract concerning the Covenant Not to Compete was not going to be complied with, "then apparently my verbal contract between you and I, as far as the $75,000 in parts credit, should no longer be valid either." Eftink and Double D thereafter refused to honor any more of the parts credit. Under the testimony, approximately $7,000 of the parts credit had been applied prior to its discontinuance by Eftink and Double D.[6]

 In their first point, Double D and the Eftinks contend that the trial court erred in considering oral testimony to vary the written contract for the purchase of the real estate because such evidence was not admissible under the parol evidence rule. In support, they argue that the real estate sales contract was unambiguous and complete, and that there were no allegations of fraud, common mistake, accident or erroneous omission. In support, they cite *Ironite Products Co., Inc. v. Samuels*, 985 S.W.2d 858, 861–62 (Mo.App. E.D.1998), where the court held:

> Extrinsic evidence of a prior agreement generally is not admissible to vary, add, or contradict terms of an unambiguous and complete written document. The parol evidence rule is not a rule of evidence; it is a rule of law. If evidence is received, with or without objection, it violates the parol evidence rule and the decision must be made solely on the writing; parol evidence may not be considered. (internal citations omitted).

The parol evidence rule, however, as a principle of substantive law, prohibits the contradiction of integrated contracts, and if the contract is incomplete the parol evi-

---

5. The evidence was clear that the promissory note and deed of trust for the purchase of the real estate was to King Equipment and not to a bank.

6. Sellers contended that $6600 of the parts credit had been used while Double D and the Eftinks contended, and the trial court found, that $7000 had been used.

dence rule does not apply. *Wulfing v. Kansas City Southern Industries, Inc.*, 842 S.W.2d 133, 146 (Mo.App. W.D.1992). *See also Stewart Title Guar. Co. v. WKC Restaurants Venture Co.*, 961 S.W.2d 874, 881 (Mo.App. W.D.1998) ("An agreement is integrated if the writing represents a complete statement of the parties' bargain.") "Since the rule prohibits contradiction of *integrated* writings, it only applies to evidence offered after the court has fully heard all the evidence relevant to the issue whether the writing in question is in fact integrated." *Wulfing* at 146–47 (citing CORBIN ON CONTRACTS § 572C(E) (Supp. 1992)). "Whether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule." *Id.* at 147 quoting RESTATEMENT (SECOND) CONTRACTS § 209(2) (1981). In *Wulfing*, the court also cited the RESTATEMENT (SECOND), § 214(a)(c) for the proposition that evidence of agreements or negotiations prior to or contemporaneous with the adoption of a writing are admissible to establish that the writing is or is not an integrated agreement. *Id.* Finally, the court, citing CORBIN ON CONTRACTS § 590 (1960), held "[m]oreover, the parol evidence rule does not exclude proof that the writing omits a fundamental assumption upon which the agreement is made." *Id.*

■ In the instant case, the real estate sales contract upon which Double D and the Eftinks rely in urging that the parol evidence rule prohibited consideration of the verbal agreement contained no language purporting to establish that it contained all of the agreements of the parties. Its recital of consideration reflected that it included not only the mutual covenants and agreements contained therein, but also "other good and valuable consideration." Eftink and King both testified that the agreement they reached concerning the

sale of the land included the parts credit which was intentionally not included in the written document executed by the parties. They disagreed concerning why it was not included in the written document, but neither version concerning that matter disputed the existence and validity of the agreement concerning the parts credit. Further proof that the written contract was not an integrated agreement so as to preclude consideration of the verbal agreement is the fact that both parties presented evidence establishing its existence, and it was honored for over one and one-half years before the dispute between the parties caused Eftink to refuse to continue to apply it. In short, it is clear that the real estate sales contract was not an integrated contract so as to preclude consideration of the verbal parts credit agreement. This point is denied.

■ In another point on appeal, Double D and the Eftinks contend that the trial court erred in considering oral testimony to vary the real estate sales contract because of the doctrine of merger, whereby prior oral agreements are deemed merged into the written contract. They argue that the written contract was unambiguous, did not indicate there were additional terms, and that there were no allegations of fraud, accident or mistake. In support, they cite *Chase Elec. Co. v. Acme Battery Mfg. Co.*, 798 S.W.2d 204 (Mo.App. E.D.1990), for the proposition that when parties enter into an agreement and reduce it to writing, the instrument is presumed to represent the entire agreement unless the writing indicates otherwise and, absent fraud, accident or mistake, all prior negotiations and conversations merge into the written agreement signed by the parties "where it appears that the written instrument is full and complete on its face." *Id.* at 209. In *Chase Electric*, however, the court found that the written doc-

**374**

uments did not appear to be a full and complete integration of the parties' agreement. *Id.*

As indicated above, the written contract relied on by Double D and the Eftinks is not a fully integrated agreement. Borrowing from the language of *Chase Electric,* the real estate sales contract here indicated that the writing was not the entire agreement by referring to "other good and valuable consideration," and merger did not occur because the contract was not full and complete on its face.

We do not ignore the fact that the doctrine of merger would also result in merger of the real estate sales contract relied on by Double D and the Eftinks with the warranty deed delivered at the closing, resulting in the contract being *functus officio* and the rights of the parties being based solely on the deed. *Missouri Home Sav. & Loan Ass'n v. Allen,* 452 S.W.2d 109, 111–112 (Mo.1970). As stated at 77 Am.Jur.2d, *Vendor and Purchaser,* § 290, however, "[c]ontractual provisions as to consideration to be paid by the purchaser are ordinarily not merged in the deed, and accordingly, evidence is admissible to show what consideration is to be paid although a deed has been accepted.... Stipulations for the performance of acts in the future are not merged in the deed." In *Hutchens Bros., Inc. v. Brownsberger,* 624 S.W.2d 538 (Mo.App. W.D.1981), the court held that "[w]here there are items of agreement outside of and beyond the conveyance itself, particularly with respect to obligations which are to be performed at a time subsequent to the date of the deed, there can be no merger so as to cut off the future obligation." *Id.* at 540. Even with reference to the warranty deed, its recital

of "other good and valuable consideration" results in the clause being "open to investigation and explanation." *Finley v. Williams,* 325 Mo. 688, 29 S.W.2d 103, 106 (1930). *See also Cochenour v. Cochenour,* 642 S.W.2d 402, 406 (Mo.App. E.D.1982) (parol evidence is admissible to show the actual consideration for a deed). Accordingly, the trial court here was not precluded from considering the testimony concerning the parts credit by the merger doctrine. This point is denied.

In their final point, Double D and the Eftinks contend that the trial court erred in finding that the real estate sales contract included a $75,000 parts credit as part of the sale price because under the statute of frauds, § 432.010, RSMo (2000),[7] any agreement that is not to be performed within one year from the making must be in writing and signed by the party to be charged. They argue that the parts credit was, by its terms, not to be performed within one year and, thus, since it was not in writing, was barred by the statute of frauds.

This point is not well taken for two reasons. First, King Equipment conveyed the real estate to Double D that was subject to the contract discussed here. The statute of frauds has no application where there has been a full and complete performance of the contract by one of the contracting parties. *Wills v. Alcorn,* 636 S.W.2d 142, 146 (Mo.App. S.D.1982); *Trimmer v. Short,* 492 S.W.2d 179, 183 (Mo.App.K.C.1973).

Additionally, in this case, it was undisputed that Double D had permitted King Equipment to utilize approximately $7,000 of the parts credit prior to the time

7. Sec. 432.010 provides, in pertinent part, that "[n]o action shall be brought ... upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith."

Eftink informed King that Double D would no longer honor it. An oral contract is valid and enforceable, irrespective of the statute of frauds, when there is proof of partial performance in furtherance of the agreement. *Pointer v. Ward,* 429 S.W.2d 269, 272 (Mo.1968); *Shumate v. Dugan,* 934 S.W.2d 589, 592 (Mo.App. S.D.1996). This point is denied.

The portion of the judgment holding that there was no meeting of the minds of the parties regarding the Covenant Not to Compete and the right of King Equipment to continue business, and that portion ordering a $200,000 reduction in the principal of the debt owed by Double D and the Eftinks is reversed. In all other respects the judgment is affirmed. The case is remanded to the trial court for further proceedings consistent with this opinion.[8]

MONTGOMERY P.J., and BARNEY, J., concur.

---

**8.** The motion of Double D and the Eftinks to dismiss is denied.