BOARD OF EDUCATION OF the
CITY OF ST. LOUIS, Missouri,
et al., Plaintiffs/Appellants,

v.

The STATE of Missouri, et al.,
Defendants/Respondents.

No. ED 88467.

Missouri Court of Appeals,
Eastern District,
Division Two.

May 15, 2007.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 18, 2007.

Application for Transfer Denied
Aug. 21, 2007.

Stefan J. Glynias, Alan C. Kohn, St. Louis, MO, for Appellants.

Paul C. Wilson, Asst. Atty. Gen., Jefferson City, MO, Rex M. Burlison, O'Fallon, MO, for Respondents.

ROBERT G. DOWD, JR., Judge.

The Board of Education of the City of St. Louis, the Individual Members of the Board of Education of the City of St. Louis in their Official Capacity ("the Board"), and the Voluntary Interdistrict Choice Corporation ("VICC")(collectively "Plaintiffs") appeal from the judgment in favor of the State of Missouri and the Missouri State Board of Education (collectively "Defendants") on their breach of contract action against Defendants. On appeal, Plaintiffs argue the trial court erred in entering judgment on behalf of Defendants because (1) under the 1999 Desegregation Settlement Agreement ("the Agreement") signed by the parties, Defendants had contractually agreed to the continued use of the state school foundation formula ("foundation formula") as originally defined in Senate Bill 781 (1998)("SB781"), (2) the term "full funding" as contained in the Agreement means the ongoing use of a proration factor of 1.0, and (3)(a) Defen-

dants' post-contract conduct of paying Plaintiffs at a proration factor of 1.0 in fiscal year 2001, when other districts were not, confirms that "full funding" was not limited only to fiscal year 2000 and (b) Defendants were judicially estopped from arguing at trial that they guaranteed a proration factor of 1.0 only for fiscal year 2000 when their original position was that "full funding" did not mean a proration factor of 1.0.[1] We affirm.[2]

This case involves a breach of contract action in which Plaintiffs alleged that Defendants failed to comply with certain financial guarantees contained in the Agreement that arose out of the St. Louis desegregation case.[3] In order to provide funding and a framework for the Agreement, the Missouri General Assembly ("General Assembly"), through SB781, made various changes to the State's funding statutes. Section 163.031, RSMo Cum.Supp.2006.[4] Some of the changes were to the statutes codifying the foundation formula, which is a complex formula utilizing many factors to determine the amount of state aid a school district will receive. The Missouri Department of

---

1. The proration factor is one element of the foundation formula, and it represents the ratio of total appropriations for state aid for education divided by the amount of state aid which would be required under the foundation formula. Section 163.031.1, RSMo Cum. Supp.2006. It is used essentially to distribute funding appropriated by the legislature among the school districts in a proportional manner according to the foundation formula.

2. Plaintiffs present three overlapping points on appeal. To facilitate addressing Plaintiffs' main arguments, we present the issues in the order they appear in Plaintiffs' original petition, as Points I and II. We address Plaintiffs' "course of conduct" and "judicial estoppel" arguments, which appear throughout their brief on appeal, as a separate point.

3. Prior to the creation of the Agreement, the St. Louis Desegregation case, *Liddell, et al. v. Board of Education, Case No. 72–0100SNL,*

was pending in the United States District Court for the Eastern District of Missouri. In February 1999, the parties entered into the Agreement to resolve the desegregation case. The Agreement resolved all the parties' claims in the desegregation case and relieved all parties of the obligations imposed on them by the various district court orders in effect at the time of the Agreement. The parties agreed as a matter of contract to abide by the terms of the Agreement and to perform their respective duties and obligations accordingly. On March 12, 1999, the District Court approved the Agreement, which is now in full force and effect. The District Court dismissed the desegregation case with prejudice.

4. Unless otherwise indicated, all further statutory references are to RSMo Cum.Supp.2006.

Elementary and Secondary Education ("DESE") employs the foundation formula to distribute the money appropriated by the General Assembly. *Id.*

In their original three-count petition, Plaintiffs claimed Defendants breached three unambiguous guarantees within the Agreement: (Count I) a guarantee to calculate Defendants' aid to Plaintiffs using the foundation formula contained in SB781 regardless of any and all subsequent amendments to those calculations or definitions by the Missouri General Assembly, (Count II) a guarantee that Defendants would "fully fund" or use a proration rate of 1.0 for lines 1(a), 1(b), 14(a), and 14(b)[5] of the foundation formula contained in SB781, regardless of whether the aid to the other school districts was being calculated with a lower proration factor, and (Count III) a guarantee that the proration factor for lines 14(a) and 14(b) would always be equal to or higher than the highest proration factor for line 1(a) or line 1(b) of the foundation formula. Plaintiffs also requested a declaratory judgment, injunctive relief, and specific performance of the Agreement.

Plaintiffs filed a motion for summary judgment which the trial court granted in their favor on all three counts of the petition. Defendants appealed the grant of summary judgment. This court held that the Agreement was ambiguous with respect to Counts I and II and remanded these counts for trial before the trial court. *Board of Educ. of City of St. Louis v. State,* 134 S.W.3d 689 (Mo.App. E.D.2004)(hereinafter "*Board I* ").[6]

On remand, Defendants asserted an affirmative defense that Plaintiffs had breached various material terms of the Agreement and had failed therefore to perform all conditions precedent to the contract. Defendants additionally asserted a counterclaim seeking judgment against Plaintiffs regarding improper use of capital funds. The trial court heard evidence on Counts I and II of Plaintiffs' petition as well as on Defendants' counterclaim. Thereafter, the trial court entered judgment in favor of Defendants and against Plaintiffs on Counts I and II of Plaintiffs' petition, entered judgment in favor of Plaintiffs and against Defendants on Defendants' counterclaim, and denied Defendant's affirmative defense as well as Plaintiffs' request for declaratory judgment, injunctive relief, and specific performance. This appeal follows.[7]

---

5. As contained in SB781, the foundation formula is used to calculate funding to all school districts in the state using certain district-specific factors. Lines 1(a) and 1(b) of the formula deal with state aid based on the number of eligible pupils, and lines 14(a) and 14(b) relate to aid for pupils eligible for free and reduced lunches, or students at "poverty level." In lines 1(a) and (b) of the formula, the number of eligible pupils in the district is multiplied by certain factors, as well as by the proration factor times the GTB per eligible pupil. Then lines 1(a) and (b) are added together to determine the "District Entitlement." Section 163.031.6. Lines 14(a) and (b) multiply the number of free and reduced lunch students by certain factors as well, which are then multiplied by the proration factor, and lines 14(a) and (b) are then added together. The foundation formula next subtracts certain statutory "Deductions" and then adds certain "Categorical Add-ons," which include lines 14(a) and (b). *Id.*

6. As to Count III, we found the Agreement to be unambiguous and in accordance with Defendants' construction that Defendants were not required to apply the highest proration factor as applied to lines 1(a) and (b) to both lines 14(a) and (b). *See Board I,* 134 S.W.3d at 699. On remand, Plaintiffs dismissed Count III of their petition in accordance with this ruling.

7. The Board and VICC, which is a non-for-profit corporation operating the Voluntary Interdistrict Transfer Program ("VITP"), filed timely their notices of appeal. The appeals

■ Our review of this case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We must affirm the trial court's judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32. We will exercise our power to set aside a decree or judgment on the ground that it is "against the weight of the evidence" with caution and with a firm belief that the decree or judgment is wrong. *Id.* We view the evidence and permissible inferences therefrom in the light most favorable to the judgment and disregard all contrary evidence and inferences. *In re Tri–County Levee District*, 42 S.W.3d 779, 782 (Mo. App. E.D.2001). The credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of any witness' testimony. *Id.*

■ In their first point, Plaintiffs argue the trial court erred in granting judgment in favor of Defendants because under the Agreement, Defendants had contractually agreed to the continued use of the foundation formula as originally defined in SB781. Specifically, Plaintiffs contend Defendants had promised that in calculating the Guaranteed Tax Base ("GTB") for application of the foundation formula for Plaintiffs' funding, Defendants would be restricted to the GTB as set forth in SB781.[8] We disagree.

In its findings of fact and conclusions of law, the trial court found there was no promise to guarantee Plaintiffs' aid using the foundation formula as laid out in SB781 without regard for any subsequent legislative changes. The substantial evidence supports the trial court's conclusion. Defendants' lead negotiator, Charles Hatfield, specifically testified Defendants never promised to calculate Plaintiffs' aid using the text of SB781 and guaranteeing a proration factor of 1.0 while ignoring all subsequent amendments. Mr. Hatfield stated Defendants agreed to disregard only those amendments to the formula that had a "disproportionate impact" on Plaintiffs. Mr. Hatfield testified Plaintiffs told him they accepted this provision. Mr. Hatfield further testified Defendants guaranteed a proration factor of 1.0 only for fiscal year 2000, and further guaranteed that the same amount of funding on a per pupil basis would be the minimal payable, or "guaranteed floor," for subsequent years. Mr. Hatfield testified that Plaintiffs told him that this promise was an acceptable compromise to them.

Additional evidence supports the trial court's finding that Defendants never guaranteed a proration factor of 1.0. Early drafts of the Agreement contained the following language:

> If the Foundation Formula is modified in such a manner as to reduce the amount of funds received by the City Board, the City Board shall be held harmless from any modification as is measured against the prior Formula's

---

were consolidated. Defendants do not appeal the judgment on their counterclaim.

8.  One component of the foundation formula is the GTB, which determines the amount of funds to be paid to a school district. Section 163.011(11). SB781 requires that the GTB use of the foundation formula be based on "the amount of equalized assessed valuation per pupil of the school district in which the

ninety-fifth percentile of the state aggregate number of pupils falls during the third preceding year and shall be equal to the state average equalized assessed evaluation per eligible pupil for the third preceding year...." *Id.* SB781 includes a definition of GTB that requires DESE to calculate the statewide GTB using total assessed valuation and student population for three years prior. *Id.*

distribution using a proration factor of 1 throughout the formula.

Mr. Hatfield testified he suggested the deletion of the 1.0 hold harmless provision which Plaintiffs accepted. This provision was eventually replaced in the Agreement by Paragraphs 11.2 and 11.3, requiring full funding under SB781 based on a per pupil payment in the first year, with such payment constituting a floor for subsequent years, and by Paragraph 11.4, requiring that only statutory changes with a "disproportionate adverse financial impact" be disregarded.

The trial court found "Mr. Hatfield to be credible in this matter." The trial court recounted and adopted as true Mr. Hatfield's testimony "that the Defendants never made a promise to calculate [Plaintiffs'] state aid using the text of SB781 in perpetuity ignoring all subsequent amendments." A credibility determination such as that made by the trial court is entitled to great deference. *In re Tri–County Levee District,* 42 S.W.3d at 782.

The trial court also found Defendants fulfilled their payment obligations under the Agreement despite subsequent legislative changes to the definition of the GTB. The substantial evidence supports the trial court's conclusion. House Bill 1711 (2002)("HB1711") changed the definition of the GTB to be based on assessed valuation and student population numbers from the average of the third and fourth preceding years, where under SB781 the GTB was based on the third preceding year. Section 163.011(12); *Board I,* 134 S.W.3d at 696. The Commissioner of Elementary and Secondary Education, D. Kent King, testified that HB1711 [9] changed the definition of the GTB in order to "level out the formula for the State, so there would [not]

be as many peaks and valleys in the amount of money that had [to be] appropriated each year." It also had the effect of reducing the rate of increase of the GTB, thus reducing the rate of increase in the entitlement calculations under the foundation formula. The ultimate effect of the GTB change was to reduce the rate of increase in state aid "entitlement" of nearly every school district, including Plaintiffs'.

Commissioner King testified he never considered exempting Plaintiffs from the new definition of the GTB, contained in HB1711, because "[t]he General Assembly passed the bill. It was, in my view, applicable to all school districts and that's the way we implemented it." The Associate Commissioner for the Division of Administrative and Financial Services for DESE, Geraldine Ogle, who had many years experience in working with Missouri's various school formulae, believed it was appropriate to apply the new GTB definition to the Plaintiffs "because it did not have any disproportionate impact. It would treat them like all districts and that seemed to be the understanding of the legislature."

Moreover, the plain language of Paragraph 11.4 of the Agreement demonstrates Defendants never agreed to Plaintiffs' alleged "no amendment" promise. Paragraph 11.4 provides:

> In making the calculations regarding the State's contractual guarantees in Paragraphs 11.2 and 11.3, any statutory or administrative change (for example, to the State foundation formula or any source of State funding for schools) or the definition of any factors used herein having a disproportionate adverse financial impact upon the county districts, the

---

9. The new GTB definition enacted by the General Assembly in HB1171 was applied to all districts statewide, including Plaintiffs' district, for the last 10 months of fiscal year 2002, and each year thereafter to the present.

new entity (or its designee), or the City Board shall be disregarded.

Plaintiffs' contend that only Paragraph 11.4 refers to increases in funding. However, Paragraph 14 unambiguously addresses the question of increases in funding and provides: "The City Board and County Districts will receive their share of increases in funding from all State and other sources on the same terms and conditions as all other Missouri school districts." Therefore, as determined in *Board I*, read together with Paragraph 14, Paragraph 11.4 gives rise to the "reasonable inference... that statutory or administrative changes to the foundation formula, sources of funding, or the definitions of factors, which do not have a 'disproportionate adverse financial impact' are permitted under the settlement agreement." *Board I*, 134 S.W.3d at 696.

The trial court reviewed the relevant extrinsic evidence, including witness testimony and early drafts of the Agreement, and rejected Plaintiffs' contention that the phrase "SB781" included a promise by Defendants to ignore any and all subsequent legislative enactments in the area of school finance and to calculate Plaintiffs' ongoing state aid on the basis of the text of that bill. The trial court further found that the plain language of the Agreement was consistent with Defendants' construction. The trial court's judgment is supported by substantial evidence. Point one is denied.

■ In their second point, Plaintiffs argue the phrase "full funding" as used in the Agreement means an ongoing guarantee that Plaintiffs' state aid will be calculated using a proration factor of 1.0 regardless of the proration factor used for other school districts. We disagree.

In its findings of fact and conclusions of law, the trial court concluded that the term "full funding" did not mean an ongoing guarantee of a 1.0 proration factor. The trial court found Defendants had kept their financial commitments to Plaintiffs as articulated during negotiation of the Agreement. Specifically, the trial court found Defendants made and fulfilled the following promises: (1) that SB781 would produce a minimum of 60 million dollars per year in funding; (2) that a proration factor of 1.0 would be used to pay Plaintiffs a per pupil amount for fiscal year 2000; (3) that Plaintiffs' state aid would never fall below that amount on a per pupil basis in future years; (4) that all amendments to the foundation formula that had a "disproportionate adverse financial impact" on Plaintiffs would be disregarded, and; (5) that the proration factors for Lines 14(a) and (b) would not fall below the proration factors for Lines 1(a) and (b), respectively.

The trial court's findings are supported by substantial evidence. At trial, Mr. Hatfield testified he had "several" conversations with counsel for Plaintiffs in which he explained that Defendants could not and would not agree to provide Plaintiffs with an ongoing guarantee of 1.0 funding. Specifically, Mr. Hatfield testified he had had conversations between 1998–1999 with Kenneth Brostron, Mark Bremer, and Dirk DeYong, counsel for the Board, VICC, and the St. Louis Public Schools, respectively. He testified he never gave in on that point because "neither the Attorney General nor any of the other State Defendants would have agreed to that and [he] didn't believe the General Assembly would have funded that type of agreement." Mr. Hatfield further testified that, ultimately, Plaintiffs told him they conceded the issue and instead accepted a guarantee of 1.0 funding in fiscal year 2000, and a further guarantee that the same amount of funding on a per pupil basis would be the minimum payable ("guaranteed floor") for subsequent years.

Other witnesses described the political "firestorm" that would have ensued if the State had made the ongoing 1.0 proration factor guarantee Plaintiffs claim. For example, State Senator John Russell testified "[t]here would have been extensive, extensive investigation, at least a hearing to hear all of this out and how did it happen, why did it happen, and see if there was some way to undo do it.... [because there] wasn't any way that St. Louis City or any other school district would come off the top first."

In addition, the trial court analyzed drafts of the Agreement as well as correspondence between Plaintiffs and Defendants to demonstrate how Plaintiffs' demand for an ongoing 1.0 proration factor guarantee was rejected, and replaced with the guaranteed per-pupil minimums, or "floors," that are found in the final Agreement. The trial court also analyzed the language of the Agreement. Specifically, the second sentence of Paragraph 11.1 which provides in relevant part: "the signatories agree that at no time will any proration factor on lines 14(a) or (b) be less than the highest proration factor applied to line 1(a) or (b) of the Foundation Formula." [10] The trial court found the purpose of this provision was to ensure "that the proration factors for Lines 14(a) and 14(b) would not fall below the proration factors for Lines 1(a) and 1(b), respectively." Associate Commissioner Ogle testified the purpose of the proration factors was to allocate funds when the General Assembly appropriated less than the total cost of the formula. The plain language of Paragraph 11.1 demonstrates proration factors less than 1.0 were anticipated and addressed by the parties in the Agreement. This provision is additional evidence that Defendants did not guarantee Plaintiffs an ongoing 1.0 proration factor contained in the phrase "full funding." The trial court's judgment is supported by substantial evidence. Point two is denied.

█ Finally, Plaintiffs argue the trial court erred in entering judgment on behalf of Defendants because (a) Defendants' post-contract conduct of paying Plaintiffs at a proration factor of 1.0 in fiscal year 2001, when other districts were not, confirms the parties' intent that "full funding" was not limited only to fiscal year 2000, and (b) Defendants were judicially estopped from arguing at trial that they guaranteed a proration factor of 1.0 only for fiscal year 2000 when their original position was that "full funding" did not mean a proration factor of 1.0 for any year. We disagree.

We first address Plaintiffs' post-contract "course of conduct" argument. In their "course of conduct" argument, Plaintiffs maintain that because Defendants applied a proration factor of 1.0 for the first two fiscal years of the Agreement, fiscal years 2000 and 2001, to Plaintiffs' funding while applying a lesser proration factor to all other school districts, this is conclusive evidence that Defendants interpreted the Agreement to guarantee "full funding," or a proration factor of 1.0, for all subsequent years. We are not persuaded by Plaintiffs' argument.

In *Board I,* the court remanded in order to determine the intent of the parties because there was a question of fact as to the meaning of "full funding" in the Agree-

---

**10.** In *Board I,* the court ordered judgment in favor of Defendants' on Count III of Plaintiffs' petition based on this provision, holding that: "When the settlement agreement is construed in conjunction with the calculations set forth in Section 163.031, the agreement requires a comparison of the proration factors applied to lines 1(a) and 14(a) and to 1(b) and 14(b), as the state contends." 134 S.W.3d at 699.

ment. *Id.* at 698.[11] On remand, the trial court found that the "course of conduct" of DESE, which employs the foundation formula to distribute the money appropriated by the General Assembly, was not dispositive of the overarching question of the parties' intent with respect to the meaning of "full funding." The trial court found that DESE's decision not to apply the fiscal year 2001 adjustment to Plaintiffs was made:

> because the impact of doing so in the other 523 school districts, relative to the total foundation formula appropriation, was minimal. Both [Commissioner] King and [Associate Commissioner] Ogle were aware that Plaintiffs had been disputing numerous financial aspects of the 1999 Settlement Agreement. [Commissioner] King believed that [foregoing the adjustments for Plaintiffs] constituted an accommodation that could avoid a political dispute and avoid "creating a storm."

The trial court's finding is supported by substantial evidence. For fiscal year 2000, the first year under the Agreement, DESE estimated proration factors of 1.0 for all lines of the formula. Therefore, throughout fiscal year 2000, DESE paid all districts using a proration factor of 1.0. By June 2001, however, the end of the "correction year" for fiscal year 2000, it had become apparent that the actual cost of the formula for fiscal year 2000 had exceeded the appropriation for that year. Accordingly, DESE set the final, adjusted proration factor below 1.0 for Line 1(b) only. But, because DESE understood that it could not adjust the proration factors for Plaintiffs downward for fiscal year 2000 and still keep Plaintiffs at or above the per-pupil minimum payments, or "guaran-

teed floors," required by the Agreement, Plaintiffs' payments were not prorated. The trial court noted DESE's conduct with respect to fiscal year 2000 was consistent with Defendants' interpretation of the Agreement. Moreover, the parties agreed that a 1.0 proration factor had to be part of the fiscal year 2000 calculations, so the fact that DESE used a 1.0 proration factor for Plaintiffs in fiscal year 2000 does not lead to the conclusion that Defendants' shared Plaintiffs' understanding of an ongoing 1.0 proration factor guarantee.

For fiscal year 2001, DESE estimated proration factors of 1.0, and made payments to *all* districts using those estimates throughout fiscal year 2001. However, by the end of the fiscal year 2001 "correction year," fiscal year 2002, DESE was again forced to revise one of the proration factors down from 1.0 to .09789. Associate Commissioner Ogle testified that the decision was made in June 2002, though preliminary adjustments may have begun earlier. Commissioner King and Associate Commissioner Ogle testified they decided not to apply this change to Plaintiffs for reasons having nothing to do with their interpretation of the Agreement.

For fiscal year 2002, the appropriation was far short of that needed to continue paying fiscal year 2002 payments with proration factors of 1.0. Thus, in June 2002, DESE was forced to revise Line 1(b) of the fiscal year 2002 proration factors below 1.0, even though the fiscal year 2002 "correction year," fiscal year 2003, had not even started. At this time, DESE decided it would not apply this adjustment to Plaintiffs. At the same time, when it became apparent that proration factors for fiscal year 2002 payments would have to be set below 1.0, DESE decided that it would

---

11. We note that the court in *Board I* did not adopt Plaintiffs' position that Defendants' post-contract conduct should necessarily be construed against them with respect to the Agreement. *Id.*

apply these adjustments to Plaintiffs along with every other district in the State. Associate Commissioner Ogle testified that these decisions occurred and were communicated to Plaintiffs in June 2002.

According to Associate Commissioner Ogle, the June 2002 decision not to prorate Plaintiffs' fiscal year 2001 Line 1(b) payment was made because the impact of doing so on the other 523 school districts, relative to the total foundation formula appropriation, was minimal. Commissioner King agreed. Commissioner King believed that leaving Plaintiffs' Line 1(b) proration factor at 1.0 constituted an accommodation that might help avoid another in an endless line of political disputes. Commissioner King stated that "With the other issues that were being discussed, and sometimes in my position I make decisions based on political ramifications, and it seemed to me like that one was the right decision to make rather than creating a storm . . ., so I made the decision to keep it 1.0 for that year." Both Commissioner King and Associate Commissioner Ogle emphasized the multitude of financial disputes being raised by Plaintiffs at the time, some arising out of the Agreement and some unrelated to it.

Associate Commissioner Ogle testified that, during and prior to June 2002, "there had been questions raised on the number of eligible pupils on which to pay VICC. There had been questions on the [Board's] tax rate, how high—what adjustments could be made in that tax rate used in the calculation." According to Associate Commissioner Ogle, by "leaving [Plaintiffs' proration factors] at 1.0 to aid the folks that were discussing any items in question in the settlement," DESE hoped to help defuse the situation, "and [Commissioner] King decided that's what to do." Associate Commissioner Ogle added, "We've

been in litigation with the City Board for 20 years or more and if we could stay out for another year, that would be great."

The trial court found that DESE's decision to treat the Plaintiffs differently than the other school districts for fiscal year 2001, while simultaneously treating them the same as all other districts for fiscal year 2002, had no probative value on the question of Defendants' intent with respect to whether the Agreement contained a guarantee of a 1.0 proration factor. Instead, the trial court found that the decision with respect to fiscal year 2001 was an "understandable and rational" accommodation to Plaintiffs over an insignificant sum of money.

The substantial evidence demonstrates that decisions to treat Plaintiffs differently than the other districts for fiscal year 2001 and to treat Plaintiffs the same as the other districts for fiscal year 2002 was not because of a "change in conduct," but merely a decision to accommodate Plaintiffs with respect to an insignificant amount of money for fiscal year 2001, while simultaneously enforcing the Agreement with respect to fiscal year 2002. The evidence shows DESE did not use a 1.0 proration factor for Plaintiffs fiscal year 2001 payments because they interpreted the Agreement as requiring a proration factor of 1.0, but did so despite their interpretation that the Agreement did not contain such a requirement.

For fiscal year 2003, Plaintiffs and Defendants agree that, at all times, DESE treated Plaintiffs the same as they did all other districts with respect to proration factors for fiscal year 2003 and later. However, DESE paid Plaintiffs more than this prorated amount for fiscal years 2004 and 2005 because the per-student minimums, or "guaranteed floors," required

it.[12]

■ In addressing Plaintiffs' "course of conduct" argument, the trial court specifically found: "While the State's performance and payment history is an extrinsic factor in analyzing the 1999 Settlement Agreement, it is not conclusive. . . . Any evidence of course of conduct is insufficient to alter the terms of the 1999 Settlement Agreement." The trial court rejected Plaintiffs' argument that from DESE's actions in June 2002 there was a reasonable inference that DESE understood the Agreement to require Defendants to guarantee Plaintiffs a 1.0 proration factor for every line and for every year thereafter. Decisions regarding fiscal years 2001 and 2002 occurred in June 2002, and the trial court found that DESE's actions were in spite of, not because of, their understanding of what the Agreement required.[13] The trial court's rejection of Plaintiffs' "course of conduct" argument is supported by substantial evidence.

Next, we address Plaintiffs' "judicial estoppel" argument. Plaintiffs contend that Defendants have taken different positions before this court and the trial court and are therefore "judicially estopped" from arguing their current position. Plaintiffs assert Defendants previously argued the Agreement never guaranteed Plaintiffs any specific monetary payments or proration factors.

■ The doctrine of judicial estoppel is intended to prevent litigants from taking a position in one judicial proceeding, thereby obtaining benefits from that position in that instance and later, in a second proceeding, taking a different position in order to obtain benefits from such a different position at that time. *Besand v. Gibbar*, 982 S.W.2d 808, 810 (Mo.App. E.D.1998).

■ Here, the record demonstrates Defendants' position has been consistent throughout this litigation. The record demonstrates Defendants' position is, and has always been, there was no promise to guarantee Plaintiffs an ongoing 1.0 proration factor. Defendants have consistently argued they committed, in addition to their other financial guarantees, to guarantee a per-pupil amount for fiscal year 2000 calculated using a 1.0 proration factor. Defendants have consistently argued, for subsequent years throughout the term of the Agreement, Plaintiffs' proration factors would rise and fall just like every other school district's in the State. Defendants have maintained that Plaintiffs' concerns about potentially losing the benefit of the changes in the SB781 foundation formula during subsequent years were addressed by guaranteeing Plaintiffs would never receive less than the per-pupil amounts actually received in fiscal year 2000. In *Board I*, the court found as follows with respect to Plaintiffs' and Defendants' positions:

> The school board specifically refers to the language "full funding of SB781" contained in sections 11.2 and 11.3 of the settlement agreement, in support of its

---

12. We note that for fiscal years 2002, 2003, 2004, 2005, and beyond, Defendants did not fund Plaintiffs using a proration factor of 1.0.

13. We reject Plaintiffs' "objective theory of contracts" argument wherein Plaintiffs contend Defendants' subsequent actions determined the terms of the Agreement. *See Don King Equipment Co. v. Double D Tractor Parts, Inc.*, 115 S.W.3d 363, 369 (Mo.App. S.D.

2003). "It is presumed that the parties' intent is expressed by the natural and ordinary meaning in the contract." *Id.* Here, the record shows the terms of the Agreement were clear and adhered to by Defendants, and the trial court did not find Defendants' subsequent conduct "dispositive" on the question of the parties' intentions with respect to the Agreement.

argument that the State agreed to guarantee the school board and VICC a proration factor of 1.0 or more in calculating its funding. The State contends these references define specific amounts, or "floors," for State aid to the school board and VICC. The State claims these provisions were intended to establish the basic level of State payments to replace the payments previously ordered by the federal court. The State asserts that the amount of state aid provided to the school board and VICC has exceeded these floors, and therefore, the State has complied with the agreement. Moreover, the State contends that even to the extent it is obligated to pay "full funding" under SB781, the foundation formula has never been a guarantee of particular amounts to any school district. The State further notes that SB781, upon which the school board relies, specifically provides for the possibility of proration.

*Board I*, 134 S.W.3d at 697. The trial court's findings of fact and conclusions of law also confirm that Defendants' arguments were consistent. The trial court found:

> The 1999 Settlement Agreement contains the following financial guarantees given by the State...; (a) a guaranteed per pupil amount for FY2000 calculated based on a proration factor of 1.0; ... (c) per pupil minimums, or "floors," for each year after FY2000 based on the actual per pupil receipts for FY2000.

The trial court's finding that any evidence of Plaintiffs' "course of conduct" argument does not alter the terms of the Agreement is supported by substantial evidence. In addition, Plaintiffs' "judicial estoppel" argument is without merit and refuted by the record. Point three is denied.

In conclusion, the trial court did not err in finding that (1) Defendants had not promised under the terms of the Agreement the continued use of the foundation formula as originally defined in SB781, (2) the term "full funding" as contained in the Agreement was not synonymous with the ongoing use of a proration factor of 1.0, and (3) Defendants' post-contract conduct of paying Plaintiffs at a proration factor of 1.0 in fiscal year 2001, when other districts were not, was not conclusive evidence the parties intended "full funding" to apply to all years subsequent to fiscal year 2000. The trial court's findings are supported by substantial evidence. Finally, Defendants' judicial estoppel argument is refuted by the record. The record demonstrates that Defendants have consistently argued throughout this litigation that they guaranteed a proration factor of 1.0 only for fiscal year 2000, and "full funding" did not mean a proration factor of 1.0.

Judgment affirmed.

GEORGE W. DRAPER III, P.J., and GARY M. GAERTNER, SR., J., concur.