**EXTENDED STAY INC.; ESA Management L.L.C.; HVM L.L.C.; BRE/ESA P Portfolio PA Properties L.L.C.; BRE/ESA P Portfolio TXNC Properties L.P.; BRE/ESA P Portfolio L.L.C.; BRE/ESA P Portfolio MD Trust; BRE/ESA Properties L.L.C.;**

BRE/ESA PA Properties L.L.C.;
BRE/ESA FL Properties L.L.C.;
BRE/ESA MN Properties L.L.C.;
BRE/ESA TX Properties L.P.; and
BRE/ESA MD Properties Business
Trust, Plaintiffs/Appellants,

v.

AMERICAN AUTOMOBILE
INSURANCE COMPANY,
et al., Defendants,

v.

International Placement Services,
Inc., Defendant/Respondent.

No. ED 97109.

Missouri Court of Appeals,
Eastern District,
Division Three.

June 19, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 25, 2012.

Application for Transfer Denied
Sept. 25, 2012.

Thomas B. Weaver, Scott T. Jansen, St. Louis, MO, James K. Lowry, Jefferson City, MO, For Plaintiffs/Appellants.

Georgia Kazakis, Shankar Duraiswamy, Washington, DC, Pro Hac Vice for Plaintiffs/Appellants.

Don V. Kelly, St. Louis, MO, For Respondent.

John P. O'Malley, Chicago, IL, Pro Hac Vice for Respondent.

SHERRI B. SULLIVAN, J.

### Introduction

Extended Stay, Inc., ("ESA") appeals from the trial court's summary judgment entered in favor of International Placement Services, Inc., ("IPSI") on ESA's broker negligence claim against IPSI set forth in Count III of ESA's petition. We affirm.

### Factual and Procedural Background

#### Parties and Incident

Approximately 250 hotels owned by ESA in 36 states suffered an estimated $75 million in damages from defective windows ESA had purchased and installed from a company called Quaker Window Products Company ("Quaker") between 1995 and 2003. The windows leaked, said leaks causing damage to the properties as well as necessitating removal and replacement of the windows themselves. In 2003, ESA filed 37 lawsuits against Quaker in 12 states to obtain compensation for damages arising out of the defective windows.

#### Consolidation of Suits, Settlement and Consent Judgment

In 2006, ESA dismissed the various lawsuits it had filed against Quaker and consolidated all of its claims against Quaker into a single action filed in the U.S. District Court for the Western District of Missouri. As part of a Consent Judgment against Quaker and a Settlement Agreement between ESA, Quaker, and four (eventually five) of Quaker's eight liability insurers, ESA ultimately agreed to a total of $55 million in damages, with Quaker to pay $30 million; and four (eventually five) of Quaker's seven liability insurers ("Settling Insurers") agreeing to pay $25 million.[1] With regard to the $30 million

---

1. Hartford agreed to pay $5 million; Trans-    portation, $13.115 million; Columbia, $5 mil-

Quaker settlement, ESA agreed to satisfy it solely by pursuing the proceeds of the insurance policies issued to Quaker by the insurers who refused to settle ("Non–Settling Insurers"),[2] and thus Quaker was not obliged to pay ESA any liquidated damages to protect Quaker's assets. Quaker also assigned to ESA certain other claims it had against third parties, to be set out later in this opinion.

### District Court's Stated Purpose of Consent Judgment

The District Court's July 25, 2006, Consent Judgment entered in favor of ESA and against Quaker stated as follows:

> WHEREAS, the Purpose of the Consent Judgment is to perfect ESA's right to bring an equitable garnishment action under [Section] 379.200 against three of Quaker's general liability insurers who declined to participate in the Settlement Agreement. Pursuant to the specific terms of the Settlement Agreement between ESA and Quaker, the Consent Judgment amount could only be enforced against [the Non–Settling Insurers].

ESA later enforced this right to bring an equitable garnishment action against the Non–Settling Insurers in Count I of its petition in civil court.

### Discovery of Gap in Insurance Coverage—Brokers

At some point prior to the Consent Judgment and Settlement Agreement, Quaker discovered that for the two consecutive years April 1, 2000 to April 1, 2001, and April 1, 2001 to April 1, 2002, there was a $1 million gap between the upper limits of its primary insurance coverage and the lower limits of its excess insurance coverage. Quaker contends it had requested no-gap insurance coverage from its insurance brokers IPSI, Wallstreet and CCMSI (hereinafter referred to collectively as simply IPSI, unless Wallstreet and CCMSI are being addressed in their individual capacities) and thus the failure to provide such no-gap coverage resulting in a gap was the fault of IPSI. IPSI had procured for Quaker a primary policy from Executive Risk Specialty Insurance Company ("Executive Risk") that provided coverage for products liability damages up to $1 million per occurrence and $1 million aggregate, and paired it with an excess policy from Non–Settling Insurer AAIC that provided $10 million of coverage for aggregate products liability damages in excess of $2 million. The AAIC policy in place called for underlying product liability limits of $2 million aggregate, but as the Executive Risk policy only provided $1 million aggregate, this resulted in a $1 million gap between the primary limit of $1 million and the $2 million point at which AAIC's excess policy attached and its $10 million in coverage started. This gap led AAIC (1) to seek rescission of its insurance policies with Quaker due to what AAIC alleged to be a misrepresentation of adherence to AAIC's policy's requirements that the primary insurance provide an aggregate $2 million underlying primary coverage; and (2) to disclaim coverage completely arguing that its excess $10 million policy coverage ($20 million when both years are counted) never attached and could never attach, because the $2 million point of attachment of the primary insur-

---

lion; and Executive Risk, $1.885 million, for a total of $25 million.

**2.** The Non–Settling Insurers were American Automobile Insurance Company ("AAIC"), Crum & Forster Specialty Insurance Compa- ny ("Crum & Forster"), and Diamond State Insurance Company ("Diamond State"). Crum & Forster eventually decided to settle with ESA after ESA filed its petition.

ance coverage was never reached and could not be reached, based on the inadequacy of the underlying Executive Risk policy.

### Quaker's Assignment to ESA of Negligence Claims against Brokers and Tort Claims against AAIC

With regard to insurance broker IPSI's alleged negligence in leaving this gap in coverage resulting in AAIC's failure to pay on its policies, Section 6 of the Settlement Agreement provides that Quaker assigned to ESA (1) whatever rights Quaker may have against any insurance broker, agent or other insurance intermediary *arising out of or relating to the Non–Settling Insurers' policies;* and (2) Quaker's rights to seek compensatory or punitive damages against Non–Settling AAIC for any extra-contractual claims. ESA later enforced these assigned rights in Counts II and III of its petition in civil court.

### Settlement Agreement Language Addressing Quaker's Limits of Liability and ESA's Limits of Recovery, both in Amount and Form of Assets Pursuable

As noted above, with regard to the $30 million Quaker settlement, ESA agreed to satisfy it solely by pursuing the proceeds of the insurance policies issued to Quaker by the Non–Settling Insurers and thus Quaker was not obliged to pay ESA any liquidated damages to protect Quaker's assets. This promise is memorialized in Section 5 of the Settlement Agreement, where ESA expressly agrees to protect Quaker's assets other than insurance assets by limiting its right to seek satisfaction of the Consent Judgment in the amount of $24.375 million only against the proceeds of the Non–Settling Insurers' policies as set forth in Exhibit C, to-wit: $500,000 from Crum & Forster, $3.875 million from

Diamond State, and $20 million plus any extra-contractual damages from AAIC for AAIC's actions. Specifically, the Settlement Agreement provides:

5. *Protection of Quaker Assets Other than Insurance Assets*

A. ESA will seek satisfaction of the consent Judgment Amount solely from the proceeds of the Non–Settling Insurers' Policies set forth in Exhibit C.

B. ESA's total recovery under the Non–Settling Insurers' Policies in connection with the Consent Judgment Amount will be limited as follows: $500,000 from Crum & Forster, $3.875 million from Diamond State, and $20 million from [AAIC]. In addition, ESA may also seek and retain any recovery which may be available in respect of any statutory, extra contractual or common law claims against [AAIC].

C. So long as Quaker complies with its material obligations under this Settlement Agreement, ESA covenants not to pursue recovery, or levy execution by garnishment or as otherwise provided by law, of the Consent Judgment Amount against any of Quaker's assets other than the NonSettling Insurers' Policies.

D. Except as otherwise set forth in this Settlement Agreement, including the provisions of this paragraph 5, ESA reserves the right to obtain judgments, levies, garnishments, executions or any other forms of legal process or actions that may be necessary or helpful to perfect or secure its right to make the Non–Settling Insurers pay for Quaker's obligations under this Settlement Agreement.

### Release

In Section 8, the Settlement Agreement also included the following Release of

Quaker by ESA from all further liability stemming from the windows incident:

8. *Releases*

Subject to its right to obtain and enforce the consent judgment described in paragraph 4 above and to otherwise enforce Quaker's compliance with its obligations under this Settlement Agreement, ESA releases Quaker from any and all other obligations and liabilities arising from any and all claims that ESA had, now has or may in the future have against Quaker, whether known or unknown, and which arise from or relate to the Underlying Claims, including but not limited to any obligations under the Remediation Agreement executed by and between Quaker and ESA on or about October 23, 2002.

### Petition and Trial

On August 30, 2006, ESA filed its three-count petition against the three Non–Settling Insurers, AAIC, Crum & Forster, and Diamond State; Quaker; and Quaker's three insurance brokers, IPSI, Wallstreet, and CCMSI. The Petition alleged a cause of action for Equitable Garnishment against all three Non–Settling Insurers (Count I); a claim for Vexatious Refusal to Pay solely against Insurer AAIC, alleging that AAIC's attempt to rescind its policies because the schedule of insurance in its policies inaccurately reflected the true coverage under the Executive Risk policies was frivolous, unfounded, and undertaken in bad faith (Count II); and a negligence claim against the broker defendants for failing to procure adequate insurance coverage and causing a gap in coverage, which ESA was entitled to recover as damages from IPSI, Wallstreet, and CCMSI (Count III). Count III also alleged that it was entitled to recover as damages the extent to which AAIC may be able to reduce or avoid its excess coverage due to the gap in underlying coverage. Count III of ESA's petition specifically states, in pertinent part, as follows:

61. As a direct and proximate result of the negligence of Wallstreet, IPSI and CCMSI, a gap in the available coverage may have been created to which ESA, as assignee of Quaker, is entitled to recover as damages from Defendants Wallstreet, IPSI, and CCMSI. To the extent that [AAIC] is able to reduce or avoid any of its coverage obligations under the umbrella policies issued to Quaker as a result of the above-described discrepancy, ESA is entitled to recover from Wallstreet, IPSI and CCMSI all damages caused by their failure to act with reasonable care, skill and diligence in their efforts to procure liability insurance for Quaker.

Non-settling Insurer Crum & Forster then settled with ESA for $500,000. The trial court bifurcated the trial. The first phase was a bench trial on Count I against remaining Non-settling Insurers AAIC and Diamond State. The second phase was a jury trial on Count II against AAIC and on Count III against the Brokers Wallstreet, IPSI, and CCMSI.

### Resolution and Disposal of Counts I and II Against Insurers

In Phase I, the trial court ruled against the remaining Non-settling Insurers, awarding to ESA $20 million from AAIC and $3.875 million from Diamond State. Shortly before the jury trial was to begin on Count II, AAIC agreed to settle with ESA, and ESA filed a motion to dismiss AAIC on June 3, 2011.[3]

---

**3.** The AAIC policies provided that where the underlying insurance is less than what is

shown in the schedule, i.e., what it was supposed to be, AAIC will apply its coverage as if

### Count III Against Brokers

CCMSI and Wallstreet each filed a motion for summary judgment on Count III of ESA's petition, arguing that ESA had no legally recognizable damages resulting from their alleged negligence. IPSI joined their motions for summary judgment as well as filing its own summary judgment motion on the same legal basis, i.e., no damages. Several theories were asserted among these three motions for summary judgment, all resulting in the contention that ESA had no legally recognizable damages resulting from the brokers' negligence.

Prior to the court deciding their motions for summary judgment, CCMSI and Wallstreet settled with ESA. However, IPSI pursued summary judgment, which it eventually procured. On April 26, 2011, the trial court granted summary judgment in IPSI's favor, without specifying the reasoning behind its agreement and decision that ESA failed to carry its burden of proof on damages. On July 19, 2011, ESA argued a Motion for New Trial as to defendant IPSI, which was taken as submitted and then denied by the trial court on July 25, 2011. On August 18, 2011, the trial court entered its Final Judgment with regard to this case and Ordered, Adjudged and Decreed that: "1. Defendants Wallstreet, CCMSI, Crum [ & Forster], Diamond State and AAIC have been dismissed with prejudice as a result of settlement. 2. Defendant IPSI is discharged. 3. Defendant Quaker is dismissed and discharged." This appeal follows.

### Appeal

Where, as here, the trial court does not specify its rationale for granting a motion for summary judgment, the trial court is presumed to base its decision on one or more of the grounds specified in the motions. *Harpagon MO, LLC v. Clay County Collector*, 335 S.W.3d 99, 102 (Mo.App. W.D.2011). An order of summary judgment will not be set aside on review if supportable on any theory. *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 243 (Mo.banc 1984). Accordingly, in its four points on appeal, ESA has set forth each of the summary judgment theories presented to the trial court along with ESA's corresponding argument as to why it considers each one insufficient to serve as grounds for summary judgment in IPSI's favor.

### Points on Appeal

In its first point, ESA contends that the trial court erred in entering summary judgment in favor of IPSI on ESA's broker negligence claim against it because IPSI was not entitled to judgment as a matter of law on the basis of undisputed facts, in that the court was wrong, legally and factually, to the extent it held that Quaker was not damaged because there were no gaps in Quaker's insurance coverage, when, for two consecutive years, Quaker's insurance program had a gap in coverage for aggregate products-related damages between the $1 million primary limit and the $2 million attachment point for excess coverage.

In its second point, ESA alleges that the trial court erred in entering summary judgment in favor of IPSI because IPSI was not entitled to judgment as a matter of law on the basis of undisputed facts, in that the court was wrong, legally and factually, to the extent it held Quaker was not damaged by IPSI's negligence because Quaker did not pay ESA for the hotel

the underlying coverage were exactly what it is in the schedule. This language protects AAIC from any deficiencies in the primary

coverage, and thus it had no basis for rescission since it would not be harmed in any way.

damage falling within the uninsured gaps. ESA maintains that Quaker paid it for the hotel damage falling within the uninsured gaps by surrendering to ESA valuable legal claims, including the broker negligence claim against IPSI, and Quaker is not required to have paid it for the damage falling within the uninsured gaps with liquid assets.

In its third point, ESA maintains that the trial court erred in entering summary judgment in favor of IPSI because IPSI was not entitled to judgment as a matter of law on the basis of undisputed facts, in that the court was wrong, legally and factually, to the extent it held Quaker was not damaged on the ground that, in exchange for the assignment of broker negligence claims, Quaker obtained a discharge of further personal liability for the uninsured damages falling within the gaps.

In its fourth point, ESA claims that the trial court erred in entering summary judgment in favor of IPSI because IPSI was not entitled to judgment as a matter of law on the basis of undisputed facts, in that the court was wrong, legally and factually, to the extent it held that ESA could not recover any damages from IPSI on the ground that ESA's Petition only sought damages from IPSI in the event that AAIC was able to avoid or reduce its coverage obligations. ESA contends its Petition sought $2 million in damages regardless of whether AAIC was able to avoid or reduce its coverage obligations and other pleadings and evidence made clear that ESA was seeking the $2 million as damages.

## Standard of Review

We review a grant of summary judgment on a *de novo* basis. *Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184, 190 (Mo.App. S.D. 2010); *ITT Commercial Fin. Corp. v.* *Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo.banc 1993). The record is reviewed in the light most favorable to the party against whom judgment was entered and that party is accorded the benefit of all reasonable inferences from the record. *ITT Commercial Fin.*, 854 S.W.2d at 376. The key to summary judgment is the undisputed right to judgment as a matter of law, not simply the absence of a fact question. *Id.* at 380.

If a movant for summary judgment is a defending party, as in the present case, a prima facie case for summary judgment may be established by showing: (1) facts that negate any one of the claimant's required proof elements; (2) that the claimant, after an adequate period of discovery, has not produced and would not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's required proof elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support an affirmative defense properly pleaded by the movant. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 381. When, and only when, the movant has made the prima facie showing required by Rule 74.04(c), Rule 74.04(e) places the burden on the non-movant to show that the movant is not entitled to judgment as a matter of law. *Id.*

## Discussion

■■■ Missouri courts have long held that a broker or agent who undertakes to procure insurance for another for compensation owes a duty of reasonable skill, care, and diligence in obtaining the requested insurance and may be sued in tort for negligent failure to procure that insurance. *Busey Truck Equipment, Inc. v. American Family Mut. Ins. Co.*, 299 S.W.3d 735, 738 (Mo.App. E.D.2009), citing *Parshall v. Buetzer*, 121 S.W.3d 548, 554

(Mo.App. W.D.2003). In the instant case, ESA's petition alleges liability on the part of IPSI strictly in tort on a negligence theory, not breach of contract or of fiduciary duty. "An agent or broker who unjustifiably and through his fault or neglect fails to obtain the requested insurance will be held liable for any damages resulting from such failure." *Busey Truck Equipment,* 299 S.W.3d at 738, citing *Zeff Distr. Co., Inc. v. Aetna Cas. & Surety Co., Inc.,* 389 S.W.2d 789, 795 (Mo.banc 1965). See also Couch on Insurance 2d, § 25:47 at 371–72. To prevail on a claim of negligent failure to procure insurance, the plaintiff must plead and prove that (1) the agent agreed to procure, for compensation, insurance from the insurance company, (2) the agent failed to procure the agreed upon insurance and, in so doing, failed to exercise reasonable care and diligence, and (3) as a result, the plaintiff suffered damages. *Busey Truck Equipment,* 299 S.W.3d at 738; *Haynes v. Edgerson,* 240 S.W.3d 189, 195 (Mo.App. W.D.2007). The primary function of tort law is to provide compensation to injured persons. See 1 Dan B. Dobbs et al., The Law of Torts § 10, at 18 (2d ed.2011). Thus, the plaintiff must prove that he *actually* incurred damages as a result. *Autry Morlan Chevrolet Cadillac,* 332 S.W.3d at 195.

In 2006, ESA pursued its broker negligence claims which Quaker had assigned to ESA, most pertinently in paragraph 61 of Count III of its petition, set forth as follows:

> 61. As a direct and proximate result of the negligence of Wallstreet, IPSI and CCMSI, *a gap in the available coverage may have been created* to which ESA, as assignee of Quaker, is entitled to recover as damages from Defendants Wallstreet, IPSI, and CCMSI. *To the extent that* [AAIC] *is able to reduce or avoid any of its coverage obligations under the umbrella policies issued to Quaker as a result of the above-described discrepancy, ESA is entitled to recover from Wallstreet, IPSI and CCMSI all damages caused by their failure to act with reasonable care, skill and diligence in their efforts to procure liability insurance for Quaker.*

[Emphasis supplied.] The allegations set forth in paragraph 61 purport to set forth the damages element of ESA's broker negligence claim against IPSI. Specifically, ESA claims that a gap *"may* have been created" by IPSI's negligence and that *"to the extent* AAIC is able to avoid the $20 million in coverage *as a result "* of said potential gap, ESA is entitled to recover damages resulting from loss of that $20 million in coverage. However, as set forth *infra,* due to the trial court's ruling on Count I of ESA's petition, no gap was created, and AAIC was not able to avoid any of its $20 million in coverage. Therefore, if there is no gap, there is no loss in coverage, and, hence, no damages.

The AAIC policies provided that where the underlying insurance is less than what is shown in the schedule, i.e., less than what it was supposed to be, for example $1 million aggregate instead of $2 million, AAIC will apply its coverage as if the underlying coverage were exactly what it is in the schedule. This language protects AAIC from any deficiencies in the primary coverage. It also incidentally closes any gap for ESA. The trial court found that AAIC was not able to reduce or avoid any of its coverage obligations to ESA under its umbrella policies, and thus ruled on Count I that AAIC was liable to the full extent of its $20 million in coverage to ESA. Therefore, no damages resulted to ESA from IPSI's actions as broker because AAIC was not able to reduce or avoid any of its coverage obligations under the umbrella policies issued to Quaker as a result of the discrepancy in coverage. In-

cidentally, this language meant that AAIC had no basis for its rescission claims, which were the subject of ESA's Count II, since the protective language in its policy ensured that it would not be harmed in any way.

ESA maintains that in spite of AAIC's full umbrella coverage, the $2 million "gap in coverage" by itself constitutes damages. Apparently, ESA believes that it should be paid $2 million just by virtue of that being the amount in underlying primary coverage that IPSI was supposed to procure but did not. However, ESA's request to IPSI as a broker was to procure gapless coverage, not a specific amount of $2 million in coverage. Rather, it was AAIC that required a $2 million underlying primary aggregate coverage for its $20 million umbrella coverage policy's attachment point. The trial court's ruling on Count I essentially rectified what ESA had asked for from IPSI but did not get, i.e., gapless coverage. The trial court's ruling made ESA's coverage gapless.

Furthermore, ESA points to no authority that a gap in coverage, by itself, constitutes damages. If it did, then the rule would not be "a broker who through his fault or neglect fails to obtain the requested insurance will be held liable for *any damages* resulting from such failure" but would be "a broker who through his fault or neglect fails to obtain the requested insurance will be held liable for that amount of requested insurance." See *Busey*, 299 S.W.3d at 738. The gap has to manifest itself in the face of some loss or liability in order to become real as opposed to speculative. Damages must be actual and real. *Autry Morlan Chevrolet Cadillac*, 332 S.W.3d at 195. Insurance coverage is paid out to cover damages; it is not paid out simply because it exists. Such a proposition on the part of ESA is incompa-

tible with the nature and purpose of insurance.

IPSI's motion for summary judgment challenges ESA to set forth evidence of unrecovered damages. ESA has failed to do so. Without evidence of actual uncovered damages from the brokers' negligence, the claim for broker negligence fails as a matter of law. Although it is not always possible to establish the amount of damages with the same degree of certainty, a claimant must establish *the fact* of damages with reasonable certainty. *Parshall*, 195 S.W.3d at 522; *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 55 (Mo.banc 2005). It is a matter of undisputed fact that ESA was unable to prove up any unrecovered loss to substantiate and complete its broker's negligence claim against IPSI.

■ ESA's allegation that the litigation costs and fees it incurred from collateral litigation with AAIC for AAIC's alleged bad faith refusal to pay and pursuit of recission of its insurance agreements with Quaker constitute damages it sustained from IPSI's negligence fails as well. It fails because ESA did not plead these damages against IPSI. In its brief, ESA asserts that it should be allowed to amend its Petition to reflect these damages. However, the time to make such a request from the trial court has passed. Furthermore, such a request would properly have been denied by the trial court, because ESA pled these damages in its Count II bad faith claim against AAIC. ESA and AAIC settled the allegations in ESA's Count II claim against AAIC. Because the collateral litigation costs and fees were asserted as damages against AAIC, with whom ESA settled, presumably they were included in the settlement amount. Thus, unless shown otherwise, ESA is precluded from seeking these same damages from IPSI, as this would constitute a double

recovery of damages. ESA has not shown otherwise.

The trial court's order that AAIC pay the $20 million in excess coverage closed the possibility of a gap between the excess coverage provided by AAIC and the $1 million in underlying primary coverage provided by Executive Risk. These facts negate the allegations of prospective damages set forth in Count III of ESA's petition.

■ Once IPSI produced facts that negated ESA's damages, and demonstrated that ESA, after an adequate period of discovery, has not produced and would not be able to produce evidence sufficient to allow the trier of fact to find the existence of damages, the burden fell upon ESA to establish some damages. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 381. Despite being faced with a motion for summary judgment and uncontroverted facts in support that it has no damages to support and complete its claim for broker negligence against IPSI, ESA has been unable to come up with any actual damages. When a client believes his broker has not followed through on his duties, the client may elect to sue for breach of contract, for breach of fiduciary duty, or in tort. *Busey Truck Equipment*, 299 S.W.3d at 738; *Emerson Elec. Co. v. Marsh & McLennan Companies*, 2011 WL 3890550, at *6 (Mo.App. E.D.2011) (internal citations omitted). It is not for us to dictate the client's choice of legal theory but to determine whether the theory pursued has merit. *Emerson Elec. Co.*, 2011 WL 3890550, at *6. Here, ESA's theory of negligence based in tort against IPSI is missing the element of damages; therefore, the theory of recovery lacks merit.

For the foregoing reasons, we find that IPSI is entitled to judgment as a matter of law on ESA's claim for broker negligence due to the failure of ESA to establish the element of damage and that ESA failed to carry its burden on rebuttal to prove otherwise.

*Conclusion*

The judgment of the trial court is affirmed.

ROBERT G. DOWD, JR., P.J., and MARY K. HOFF, J., concur.