

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| THE ARBORS AT SUGAR CREEK HOMEOWNERS ASSOCIATION, INC., ET AL., | ) ) ) ) | No. ED99730 |
| Plaintiffs/Appellants, | ) ) | Appeal from the Circuit Court of St. Louis County |
| vs. | ) ) | Honorable Gloria Clark Reno |
| JEFFERSON BANK & TRUST COMPANY, INC., | ) ) ) | |
| Defendant/Respondent/Cross-Appellant, | ) ) | Filed: October 28, 2014 |
| AND | ) ) | |
| MCKELVEY HOMES, LLC, | ) ) | |
| Defendant/Respondent. | ) | |

### I. INTRODUCTION

Ten residents and homeowners of a subdivision located in St. Louis County ("Homeowners") appeal the trial court's judgment dismissing their petition for declaratory judgment and claims for damages, and granting declaratory relief in favor of Jefferson Bank & Trust Co., Inc. ("Bank") and McKelvey Homes, L.L.C. ("McKelvey").[1] Homeowners raise six points. Their first point challenges the trial court's

---

[1] The Arbors at Sugar Creek Homeowners Association remains listed as a plaintiff in the caption, yet the final amended petition filed by the plaintiffs in this case does not refer to the entity, and this entity has abandoned all of its claims.

ruling on partial summary judgment that the neighborhood association Bank formed is authorized to govern the subdivision. Homeowners' remaining points challenge the court's entry of final judgment, contending the trial court erred in: (2) finding that Bank did not violate the subdivision's covenants when it appointed its own executives—non-residents of the subdivision—to the neighborhood association's board of directors; (3) finding that Bank's executives acted reasonably and not in bad faith when, in their capacity as directors, they approved McKelvey's plans to develop houses in the subdivision; (4) finding McKelvey's construction plans do not violate the subdivision's architectural covenants; (5) ordering Homeowners to reimburse Bank for certain subdivision maintenance costs allegedly incurred by Bank; and (6) entering judgment in favor of Bank and McKelvey on Homeowners' remaining claims for damages. Bank raises two points on cross-appeal, arguing the trial court erred in dismissing on summary judgment its counterclaims for slander of title and abuse of process. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The events giving rise to this appeal continued to unfold even after Homeowners filed their initial petition for injunctive relief in St. Louis County Circuit Court. Accordingly, there were a number of amended pleadings and pre-trial proceedings. The facts pertinent to this case are therefore somewhat dense and difficult to follow. We do our best to summarize them here.

In 2005 and 2006, Evolution Developments L.L.C. ("Developer") received two loans from Bank, secured by deeds of trust, to purchase and develop "The Arbors at Sugar Creek Subdivision," an eighteen-lot residential subdivision in St. Louis County

(the "Subdivision"). By end of 2009, Developer had built and sold to Homeowners the first five homes in the Subdivision.

The parties agree all eighteen lots are subject to an indenture recorded in May 2006 with the St. Louis County Recorder of Deeds, entitled, "The Declaration of Covenants, Conditions and Restrictions" (the "Declaration"). The Declaration controls "the general plan of development . . . [for] all [eighteen lots] . . . for the mutual benefit of [Developer] and all persons who may purchase, hold or own . . . the [lots]." It lays out rules for governance of the Subdivision and provides for the creation of a neighborhood association to enforce its covenants and restrictions. The Declaration originally called for creation of a neighborhood association called "The Arbors at Sugar Creek Homeowners' Association," ("Arbors Association") and required that the association be "organized . . . not later than the first conveyance of title to a Lot." The Declaration describes various covenants and restrictions, including architectural design criteria for the construction of new houses. The architectural covenants also provide that no owner shall construct any "new Unit" on a Lot "without prior written consent of the Board." In approving or rejecting any proposed construction, "the Board shall consider harmony of exterior appearance with the existing improvements in the Subdivision, including architectural design, height, grade, topography, drainage . . . , color and quality of exterior materials and detail, location, construction standards, and other such criteria." As Developer's lender, Bank consented by affidavit to the terms of the Declaration and recorded with the St. Louis County Recorder of Deeds its agreement to subordinate the deeds of trust to the Declaration.

Consistent with the Declaration, Developer created the original neighborhood association, Arbors Association, in 2005. However, Developer failed to appoint officers or directors to Arbors Association's board, conduct any meetings, or file with the Missouri Secretary of State the annual registration reports required by law. Consequently, the Secretary of State administratively dissolved Arbors Association in 2006.[2]

In March 2010, Developer defaulted on Bank's loans, and Bank acquired the Subdivision's remaining thirteen undeveloped lots through foreclosure. Bank then entered into discussions with various developers regarding the future of the unsold lots before executing an option agreement with McKelvey for the purchase of the unsold lots. The agreement granted McKelvey the option to purchase, build upon and sell the remaining lots. Under the terms of the agreement, Bank agreed to "designate and appoint" directors to the Subdivision's neighborhood association. Bank would then "cause" the Subdivision's neighborhood association "to review" a master set of McKelvey's architectural plans for homes that "McKelvey intends to construct," and "either approve such plans . . . or advise [McKelvey] with reasonable specificity of any objections" and propose revisions that would then cause the plans to be approved. Defendants agreed to split the profits (25% to Bank and 75% to McKelvey). When McKelvey began advertising its construction plans, however, Homeowners formed their own neighborhood association and appointed a "Design Review Committee" to review the plans depicted in McKelvey's marketing materials. Following the Committee's review of the plans, Homeowners notified Defendants that the Design Review Committee had determined the construction plans were in violation of the Declaration's architectural

---

[2] On appeal, no party contends that a valid neighborhood association existed at the time this lawsuit was filed.

4

covenants. In May 2010, having failed to persuade Defendants to alter the construction plans, Homeowners brought suit.

In their initial petition, Homeowners sought only declaratory judgment against Defendants. They alleged that Bank and McKelvey planned to build "tract homes" that violated the Declaration's architectural covenants and restrictions, "in numerous respects including, but not limited to: architectural style; height; exterior construction materials, including . . . vinyl siding . . . roofing shingles; location of the home on the lots; and value." Homeowners requested, in relevant part, a declaratory judgment from the court as to "whether the plans of the Bank and McKelvey for construction of new homes in the Subdivision violate the [architectural] Covenants." At the same time, Homeowners also recorded with the St. Louis County Recorder of Deeds a notice of lis pendens, providing notice to third parties that a lawsuit affecting the unsold lots was pending.

In June 2010, before answering Homeowners' petition, Defendants obtained a building permit to construct a model home in the Subdivision. Consequently, Homeowners filed a motion for a temporary restraining order to enjoin Defendants "from initiating or continuing any construction" during the pendency of the action. After a hearing, the trial court denied Homeowners' motion for a temporary restraining order. Without elaboration, the court also ruled that Homeowners could "refile" their motion for a temporary restraining order "at a future date."

Thereafter, Defendants filed their answers to Homeowners' petition for declaratory judgment. Bank's answer included counterclaims that, later amended, sought a declaratory judgment against Homeowners on the same issues presented, as well as

5

damages for: (1) slander of title and (2) abuse of process, due to the notice of lis pendens that Homeowners had filed with their petition.

After Homeowners filed their petition for declaratory judgment, Bank acquired from Developer an assignment of "all of" Developer's "rights, title and obligations . . . under the Declaration." In September 2010, because the Subdivision's original neighborhood association had been dissolved, Bank formed the ASC Homeowners' Association, Inc. ("ASC HOA"), and called a meeting of lot owners. At this meeting, Bank exercised its bloc of thirteen lot-ownership votes (or 72% of the total lot-owner votes)[3] to amend the Declaration, replacing the name Arbors Association with the name ASC HOA.[4] Bank elected three of its executives to serve on the board of directors for ASC HOA. In November 2010, these three directors approved McKelvey's plans for construction of houses on the Subdivision's lots.

Bank also filed a motion for partial summary judgment "with respect to the issue of whether [ASC HOA] is the duly authorized successor homeowners' association of [the Subdivision]."[5] Homeowners opposed the motion. After an evidentiary hearing, the trial court granted Bank's motion for partial summary judgment, ruling that ASC HOA is the Subdivision's "duly authorized homeowners association."[6]

After the court granted partial summary judgment to Bank, Homeowners called an ASC HOA meeting in early 2011, to elect three Subdivision residents to ASC HOA's

---

[3] As explained more fully, infra, the Declaration allows that it "may be amended by vote or agreement of the Owners of Lots to which sixty-seven percent (67%) of the votes in the Association are allocated."

[4] As so amended, the Declaration currently designates ASC HOA as the Subdivision's governing neighborhood association.

[5] Bank, however, specifically requested that the court refrain from determining whether or not Bank was authorized to appoint its own executives to the Board, an issue we discuss infra.

[6] However, per Bank's request, the court made "no ruling regarding the legitimacy of the current board of directors for [ASC HOA]."

board of directors. Bank attended the meeting, and exercised its majority bloc of thirteen lot-ownership votes to reject Homeowners' three nominees. Bank then voted to amend the Declaration a second time, removing language in the Declaration that stated only residents could serve on ASC HOA's board of directors.[7] Following this second amendment to the Declaration, Bank voted to "ratify" its executives' prior actions, approving McKelvey's development plans, including its plans to build a house on Lot 13 (the "Lot 13 Home").[8] Bank then voted again to elect its own non-resident executives to serve on ASC HOA's board of directors.

While this suit was pending in circuit court, McKelvey began constructing the Lot 13 Home. Homeowners then filed another motion for a temporary restraining order and preliminary injunction against further construction. In their motion, Homeowners argued that Defendants had "violated the Declaration" by grading the land and beginning construction of the Lot 13 Home (1) without receiving approval of a "properly authorized" board of directors and (2) in violation of the "architectural requirements of . . . the Declaration." Bank opposed the motion. The court held an evidentiary hearing over the course of two days, and denied Homeowners' motion.

In December 2011, Homeowners filed a "Combined Motion for Partial Summary Judgment" regarding Bank's counterclaim for slander of title and abuse of process. The next day, Homeowners filed their fourth and final amended petition against Defendants. In their amended petition, Homeowners alleged, in relevant part that: (1) under the terms of the Declaration, the ASC HOA should have been composed of residents of the

---

[7] Bank also voted to remove language from the Declaration requiring that the neighborhood association's board of directors ultimately be composed of lot owners "other than Declarant [the person originally defined as Developer]."

[8] The parties under contract to purchase the home on Lot 13 are not parties to this action.

7

Subdivision; (2) "none of the Bank executives elected by the Bank to serve as board members were or are residents of the Subdivision;" (3) "Bank deleted the board membership [residency] requirements . . . from the Covenants," and (4) "deletion of these requirements violates the Covenants, which intended to protect [H]omeowners in the Subdivision by guaranteeing them exclusive membership on the board after the Period of Declarant Control [expired]." Homeowners' first count sought declaratory judgment regarding, inter alia, "whether the Bank's deletion of certain membership requirements found in the Covenants for the board of [ASC HOA] was valid." Arguing further:

> "Bank is not the 'Declarant' as that term is defined in the Covenants . . . Bank does not have authority to govern the Subdivision; [and] Bank's deletion of certain membership requirements found in the Covenants for the board of Bank HOA was not valid or authorized. All actions taken by the Bank's executives, as purported board members of [ASC HOA], are ultra vires, null and void."

In addition to Homeowners' first count seeking declaratory judgment and an injunction against Bank and McKelvey regarding their current development plans, Homeowners added four counts seeking damages. Specifically, Homeowners alleged: (1) Bank breached its fiduciary duty to Homeowners because "Bank owes fiduciary duties to Homeowners due to its self-proclaimed 'Declarant' status and due to its majority position in [ASC HOA];" (2) "civil conspiracy" against Defendants for causing "a modification" of the Subdivision's previously-approved "Subdivision Landscape Plan," when they removed "71 trees planned for a tree-lined streetscape," in violation of the Declaration; (3) "tortious interference" against Defendants for taking "several steps to cause a breach of [the Declaration]," thereby interfering with Homeowners' "expectancies" arising out of the Declaration; and (4) "nuisance" against Defendants for, inter alia, beginning

8

"construction of a tract house" in violation of the "architectural requirements contained in . . . the [Declaration]."

Defendants timely filed their answers. Additionally, Bank contested Homeowners' motion for partial summary judgment on Bank's counterclaims, and filed a cross-motion, seeking partial summary judgment on the same counts raised in its counterclaim (i.e., slander of title and abuse of process).

Soon thereafter, Homeowners filed a second motion for partial summary judgment against both Defendants on the issue of "why the Bank's executives . . . are not proper board members under the recorded indenture that governs the subdivision." [9] In this motion, Homeowners argued that Bank's executives "fail the Declaration's eligibility requirements" and, therefore, could not validly serve on ASC HOA's board of directors because they were not residents of the Subdivision. Homeowners further argued that "Bank's purported amendment to the Declaration—to remove those requirements its executives failed to meet—is invalid under Missouri law." Among the reasons offered by Homeowners as to why Bank's amendment, removing the residency requirement, was invalid under the law, was that the amendment resulted in Bank breaching its "duty of good faith and fair dealing" under the Declaration. Homeowners' motion requested that the court: "declare that the board of the [ASC HOA] is not—and has never been— properly constituted . . . [and] rule and declare that all actions taken by the [ASC HOA] are null and void."

On February 9, 2012, the trial court held an evidentiary hearing on the parties' outstanding motions for summary judgment, as well as on Homeowners' and Bank's

---

[9] Thus, Homeowners filed two separate motions for partial summary judgment. The first sought dismissal of Bank's counterclaims for slander of title and abuse of process. The second sought a summary judgment nullifying all actions taken by ASC HOA's board.

9

competing claims for declaratory relief.[10] At the conclusion of the first day, the trial court declined to rule on the motions, and continued the matter to hear additional testimony and evidence over the course of three more days regarding Homeowners' and Banks' competing claims for declaratory relief and damages.[11]

Thereafter, while the matters were under submission, Bank filed a motion for reimbursement of funds it had provided to ASC HOA for upkeep and maintenance of the Subdivision's common grounds. In its motion, Bank asked the court to order Homeowners to pay their pro rata portion of these costs. On November 20, 2012, the trial court conducted a hearing on the motion. The court then entered an interlocutory order granting Bank's motion and ordering Homeowners to separately reimburse Bank their pro rata share of expenses that Bank paid on behalf of ASC HOA.

On December 20, 2012, the trial court entered "Findings of Fact and Conclusions of Law on Plaintiff's Request for a Permanent Injunction." The court found that Bank had properly amended the Declaration to remove the residency requirement, and, therefore, its executives were qualified to serve as members of the ASC HOA board. The court further found that the board properly approved McKelvey's plans for construction of the Lot 13 Home, and these plans did not violate the Declaration's architectural covenants. Based on these findings, the court denied Homeowners' request for permanent injunction, and summarily found "all issues in favor of Defendants."

---

[10] At the outset of the first day of hearings, Homeowners' counsel explained: "[a]s a matter of orientation, we're here not only on the motions for summary judgment, and there are three of them in the file, but we're also here on an evidentiary hearing that relates to the equitable issues in the case."

[11] Homeowners' counsel stated, and the court agreed, "that the purpose of this hearing is to clean up all the equitable issues before the jury trial at the request of the Defendants." As the evidentiary hearing continued into the second day, counsel for both parties sought clarification from the court with respect to the status of their competing motions for summary judgment. The court indicated: "why don't we just do this. Since we are here and we have the time to do it, why don't we just – you know, each person can put on that evidence that you think you need to put on in order to make your points."

10

The parties to this appeal then filed separate motions seeking clarification with respect to the trial court's findings. In response, the court entered an order entitled "Final Judgment." The court clarified that of the three outstanding motions for summary judgment, the court granted Homeowners' motion for partial summary judgment in favor of Homeowners on Bank's counterclaims for slander of title and abuse of process. The court denied "all other pending [summary judgment] motions as moot." With respect to Homeowners' fourth amended petition, the court entered "final judgment . . . in favor of Defendants . . . on all counts asserted [by Homeowners]," as well as declaratory judgment in favor of Bank. The court stated, with respect to Bank's claim for reimbursement of maintenance expenses: "consistent with this Court's interlocutory Order of November 20, 2012, a monetary Final Judgment is entered in favor of [Bank] and against [Homeowners]." Next, the court ordered Homeowners to release the lis pendens previously filed with the St. Louis County Recorder of Deeds.[12] The court added: "this final Judgment is meant to conclude all matters before this Court." Homeowners, and Bank and McKelvey timely filed this consolidated appeal.

### III. STANDARD OF REVIEW

Our review of the court's grant of summary judgment is de novo. ITT Comm. Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). "[W]e review the record in the light most favorable to the non movant." Loeffler v. City of O'Fallon, 71 S.W.3d 638, 639 (Mo. App. E.D. 2002). We afford the non-movant the benefit of all reasonable inferences that can be drawn from the record. ITT, 854 S.W.2d

---

[12] Homeowners sought a writ of prohibition to vacate that portion of the January 22, 2013 judgment ordering them to release the lis pendens. In State ex rel. Lemley v. Hon. Gloria C. Reno, No. ED 99612, 2013 WL 1209615, at *2-3 (Mo. App. E.D. Mar. 26, 2013), this Court ruled that Homeowners are entitled to retain their lis pendens during the pendency of this appeal.

at 376. "The key to summary judgment is the undisputed right to judgment as a matter of law," not simply the absence of a dispute over genuine issues of material fact. Extended Stay Inc. v. American Auto. Ins. Co., 375 S.W.3d 834, 841 (Mo. App. E.D. 2012).

We review the trial court's denial of Homeowners' petition for declaratory judgment and injunctive relief, as well as its grant of declaratory judgment to Bank, under the standard set forth in Murphy v. Carron, 536 S.W.2d 30 (Mo. banc 1976). Opponents of Prison Site, Inc. v. Carnahan, 994 S.W.2d 573, 577 (Mo. App. W.D. 1999); Blue Pool Farms, L.L.C. v. Basler, 239 S.W.3d 687, 690 (Mo. App. E.D. 2007). We will "sustain the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law." Blue Pool Farms, 239 S.W.3d at 690. "We view the evidence and permissible inferences therefrom in the light most favorable to the judgment and disregard all contrary evidence and inferences." Board of Educ. of St. Louis v. State, 229 S.W.3d 157, 161 (Mo. App. E.D. 2007). We review questions of law, including the court's interpretation of the language of the Declaration, de novo. Blue Pool Farms, 239 S.W.3d at 690.

## IV. DISCUSSION

### A. HOMEOWNERS' POINTS ON APPEAL

#### 1. Authority of ASC HOA to Govern the Subdivision

In their first point, Homeowners contend that the trial court erred as a matter of law by finding that Bank's newly-formed neighborhood association (ASC HOA) has authority to govern the Subdivision.[13] Homeowners argue that ASC HOA has no such

---

[13] No party contends that there remain genuine issues of material fact. Rather, the parties disagree on how to apply the law to the undisputed facts.

12

authority, because it is not the original Arbors Association designated in the Declaration, and Missouri case law requires that a successor association receive an assignment of rights from the original association, which did not occur here.

Both Bank and McKelvey respond that the language of the Declaration permits ASC HOA to govern without an assignment from Arbors Association; however, they offer different rationales. Bank argues ASC HOA may govern because Bank received an assignment of rights from Developer, which entitled it to create ASC HOA. McKelvey argues ASC HOA has authority to govern because the amended Declaration designates ASC HOA as the neighborhood association.

*a. The Declaration Grants ASC HOA the Authority to Govern the Subdivision*

As McKelvey contends, ASC HOA has the authority to govern the Subdivision. Specifically, the plain language of the Declaration permits Bank, as owner of 72% of the Subdivision's lots, to amend the Declaration to replace Arbors Association with another neighborhood association that serves the same role.

Generally, a subdivision's declaration establishes the extent of a neighborhood association's authority to enforce its covenants and restrictions, including whether the association may transfer such authority to another person.[14] See DeBaliviere Place Ass'n v. Veal, 337 S.W.3d 670, 677 (Mo. banc 2011) (examining first "whether the declaration

---

[14] A subdivision's declaration is a restrictive covenant that "runs with the land," which means it is binding on Developer, Homeowners, and Bank, as well as their successors in interest to the lots. See McLaughlin v. Neiger, 286 S.W.2d 380, 383 (Mo. App. 1956) ("All covenants which relate to land and are for its benefit run with it, and may be enforced by each successive assignee into whose hands it may run by conveyance or assignment."); Marshall v. Pyramid Dev. Corp., 855 S.W.2d 403, 406 (Mo. App. W.D. 1993) ("The Declaration regulates the relationship of the real estate developer to its subdivision, as well as the purchasers of property."); see also Wheelock v. Gibson, 744 S.W.2d 464, 466-467 (Mo. App. W.D. 1987) (noting real covenants run with the land, and personal covenants, when recorded, provide constructive notice to successors in interest, thereby binding them as well.). It is governed by the same rules of construction applicable to any covenant or contract. See Kling v. Taylor-Morley, Inc., 929 S.W.2d 816, 819 (Mo. App. E.D. 1996).

specifies any particular procedure for assigning rights or liabilities" to a successor association); Sherwood Estates Homes Ass'n v. Schmidt, 592 S.W.2d 244, 247 (interpreting language of declaration to determine whether association has authority to govern based on assignment from the developer); Pioneer Point Homeowners Ass'n v. Booth, 179 S.W.3d 397, 402 (Mo. App. S.D. 2005) (holding declaration permitted assignments of authority from original neighborhood association to successor). "When interpreting the declaration—which is simply a contract—it is necessary to ascertain the intent of the parties and give effect to that intention." DeBaliviere Place, 337 S.W.3d at 676-677. "In an unambiguous contract, the intent of the parties is to be discerned from the contract alone." Id. at 677. We look to the plain, ordinary, and usual meaning of the words found in the declaration, and consider the document as a whole. See Kohner Props., Inc. v. SPCP Grp. VI, 408 S.W.3d 336, 342 (Mo. App. E.D. 2013) (applying rules of contract construction). We construe each term to avoid rendering other terms meaningless. Id. at 342-343. Only where the meaning is in doubt is it proper to consider the intentions of the parties by inquiring into the purpose sought to be accomplished and the accompanying circumstances at the time of the restrictive covenant. Kling, 929 S.W.2d at 820.

Here, the plain language of the Declaration is unambiguous. The Declaration expressly allows that it may be amended "by vote or agreement of the Owners of Lots to which sixty-seven percent (67%) of the votes in the Association are allocated." Bank, a mortgagee "who acquired title pursuant to foreclosure or deed in lieu of foreclosure," is expressly included within the Declaration's definition of lot owners who may vote to amend the Declaration. Additionally, the Declaration expressly states that lot owners may

"modify" or "eliminate" the Subdivision's governing neighborhood association, provided an "*adequate substitution is made.*"[15] (emphasis added). Thus, the plain language of the Declaration permitted Bank to cast its thirteen of the total eighteen lot-ownership votes (72%) to amend the Declaration to replace Arbors Association with ASC HOA as the valid governing association for the Subdivision.[16]

### b. Homeowners' and Bank's Arguments are Unpersuasive

Homeowners contend that ASC HOA has no authority to govern, because it is not the original neighborhood association designated by the Declaration. This argument lacks merit. Again, the plain and unambiguous language of the original Declaration defined the governing neighborhood association as "The Arbors at Sugar Creek Homeowners' Association . . . and its successors and assigns." The phrase "successors and assigns" is express evidence that the Declaration allowed for the possibility that another entity would succeed the original Arbors Association. See Pioneer Point, 179 S.W.3d 397, 402 (Mo. App. S.D. 2005) (ruling "successors and assigns" is express evidence that declaration permits another entity to succeed original neighborhood association). Thus, the Declaration does not prevent ASC HOA from assuming governance of the Subdivision as a successor neighborhood association.

---

[15] Homeowners do not argue, and we do not find, that the amendment replacing Arbors Association with ASC HOA did not provide "adequate substitution" because they serve the same role.

[16] Homeowners reply that Bank's amendment was not valid because only one lot owner, Bank, voted to amend the Declaration. But this contention ignores the plain language of the Declaration. Here, the Declaration permits amendments: "only by vote or agreement of the Owners of Lots to which sixty-seven percent (67%) of the votes in the Association are *allocated*." (emphasis added). "Allocated Interests" is defined as follows: "[e]ach Owner's vote in the Association for all purposes shall be allocated on an equal basis, i.e., the Owner of *each* Lot having one vote." (emphasis added). Thus, the Declaration affords Bank a vote for *each* of its thirteen lots, and Bank is not limited to casting a single vote as a lot owner, as Homeowners contend. Instead, Bank validly transferred Arbors Association's authority to ASC HOA by amending the Declaration when it cast all thirteen of its lot-ownership votes to substitute ASC HOA for Arbors Association.

In the alternative, Homeowners argue that ASC HOA may govern the Subdivision only if it received an assignment of rights from Arbors Association. In support of its argument, Homeowners cite DeBaliviere, 337 S.W.3d 670, and Valley View Village South Improvement Ass'n v. Brock, 272 S.W.3d 927 (Mo. App. S.D. 2009). We find these cases to be unpersuasive.

First, DeBaliviere and Valley View are distinguishable on the facts. Both cases concerned an assignment of rights between two neighborhood associations and not, as is the case here, between Developer and its purported successor developer who then created a successor neighborhood association. See DeBaliviere, 337 S.W.3d at 672-673 (holding dissolved neighborhood association can transfer rights to another association as part of statutory winding-up process of corporate entity); Valley View, 272 S.W.3d at 930-931 (holding new neighborhood association had no authority to govern absent assignment of right or other "legal obligation agreed to" by predecessor association). Second, neither case stands for the proposition that an assignment between neighborhood associations is necessarily required for a successor neighborhood association to assume governance of a subdivision. To the contrary, both cases recognize that a contractual agreement, such as the instant Declaration, may lawfully dictate how a successor association assumes authority. See DeBaliviere, 337 S.W.3d at 673 (looking beyond language of declaration only because it failed "to specify any particular procedure for assigning rights or liabilities"); Valley View, 272 S.W.3d at 931 (concluding a legal agreement to recognize successor association is required).

Lastly, Bank mistakenly argues that it received the power to install ASC HOA as the governing body of the Subdivision through Developer's assignment of rights. But the

16

Declaration makes no mention, express or otherwise, of Developer's right to form additional or successor associations, or to transfer such a right to others.[17] Rather, it merely provides that Developer must form the first neighborhood association "not later than the first conveyance of title to a Lot."[18] We cannot look beyond this limited provision to assign Bank a right that the parties did not agree upon. See Valley View, 272 S.W.3d at 931.

*c. Point I Conclusion*

For the foregoing reasons, we hold that the plain language of the amended Declaration supports the conclusion that ASC HOA is the valid governing neighborhood association for the Subdivision. Accordingly, we find no error in the trial court's ruling on partial summary judgment that ASC HOA is "duly authorized" to govern the Subdivision. Point denied.

**2. Homeowners' Petition for Declaratory and Injunctive Relief (Count I) Regarding the Validity of ASC HOA's Board of Directors**

In their second point, Homeowners contend the trial court erred by denying their Count I claim for declaratory and injunctive relief, after finding Bank's executives may lawfully serve as board members on the neighborhood association's board of directors.

---

[17] The Declaration does list a number of rights that Developer, "as Declarant," may "transfer, assign, or convey." For instance, the Declaration provides that the Declarant may transfer the right to: (1) complete improvements, (2) exercise development rights on the Subdivision lots, (3) erect advertising signs, (4) maintain unit models, (5) locate construction trailers in the Subdivision, (6) "appoint or remove any member of the Board during the Period of Declarant Control as set forth in Section 3.5." As the Declaration was otherwise very specific regarding transferable rights, we must presume that the omission of the right to form a successor neighborhood association was intentional. See Heartland Presbytery v. Gashland Presbyterian Church, 364 S.W.3d 575, 586 (Mo. App. W.D. 2012) (applying rule of *expressio unius est exclusio alterius* or "the expression of one thing is the exclusion of another" when interpreting contractual language); see also Scott v. Ranch-Roy-L, Inc., 182 S.W.3d 627, 633 (Mo. App. E.D. 2005) (limiting ability of the developer of a platted subdivision to assign its rights because a developer's rights are generally personal rights that do not run with the land).

[18] Homeowners admitted in circuit court that the Declaration provided Developer with this authority.

Specifically, Homeowners argue, inter alia, that the original Declaration required board members to be residents of the Subdivision, Bank's executives were not residents of the Subdivision, and Bank violated the Subdivision's implied covenant of good faith and fair dealing when it amended the original Declaration by removing the board member residency requirements. In support, Homeowners cite Rocky Ridge Ranch Property Owners Ass'n v. Areaco Investment Co., 993 S.W.2d 553 (Mo. App. E.D. 1999). Bank and McKelvey respond that Rocky Ridge is distinguishable, and that Bank properly followed the Declaration's procedures in appointing its executives to ASC HOA's board of directors. We agree with Homeowners.

In an action for declaratory judgment, the trial court has the authority to "declare rights, status, and other legal relations whether or not further relief is or could be claimed . . . [t]he declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree." Section 527.0101, R.S.Mo. (2000). Although Homeowners have not included a separate count alleging that Bank violated the covenant of good faith and fair dealing, this legal theory supports Homeowners' action for declaratory judgment and injunctive relief. See Polk Cnty. Bank v. Spitz, 690 S.W.2d 192, 194 (Mo. App. S.D. 1985) (recognizing a petition seeking declaratory relief may be based on a legal theory, regardless of whether a separate count seeking damages is included based on the same legal theory); City of Creve Coeur v. Creve Coeur Fire Prot. Dist., 355 S.W.2d 857, 859 (Mo. 1962).

*a. Bank Violated the Covenant of Good Faith and Fair Dealing*

As Homeowners contend, we find as a matter of law that Bank violated the Declaration's implied covenant of good faith and fair dealing by amending the

Declaration and removing the board member residency requirements. Bank then unilaterally appointed its own non-resident executives to the board, thereby circumventing the Declaration's requirement that ASC HOA's board of directors be composed of subdivision residents.

The covenant of good faith and fair dealing is breached if Bank's actions violate the spirit of the Declaration and deny the other lot owners an expected benefit of the Declaration. See Glenn v. HealthLink HMO, Inc., 360 S.W.3d 866, 879 (Mo. App. E.D. 2012). "Good faith is an 'obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting.'" Frontenac Bank v. T.R. Hughes, Inc., 404 S.W.3d 272, 280 (Mo. App. E.D. 2012) (quoting Schell v. LifeMark Hosps. Of Mo., 92 S.W.3d 222, 230 (Mo. App. W.D. 2002)).

To prove violation of the covenant of good-faith and fair dealing, Homeowners must present "substantial evidence" that Bank "acted in bad faith, or engaged in unfair dealing." Acetylene Gas Co. v. Oliver, 939 S.W.2d 404, 410 (Mo. App. E.D. 1996). "Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty." Restatement (Second) of Contracts § 205 (1981). Examples of bad faith actions recognized in Missouri include: (1) "utiliz[ing] contract language that allow[s] unilateral action to improperly deny the other party from expected benefits flowing from the contract," Koger v. Hartford Life Ins. Co., 28 S.W.3d 405, 412 (Mo. App. W.D. 2000) (citing Martin v. Prier Brass Mfg. Co., 710 S.W.2d 466, 473 (Mo. App. W.D. 1986) (exercising judgment "conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit

19

of the contract," violates the duty of good faith)); and (2) effectuating an amendment to a subdivision's declaration through a "devious attempt to circumvent" the intent reflected in that agreement, Rocky Ridge, 993 S.W.2d at 556.

Homeowners argue that the facts in Rocky Ridge, 993 S.W.2d at 556, are comparable to the instant case. In Rocky Ridge, the subdivision's indenture provided that it could be amended by a vote of two-thirds of the lot owners. 993 S.W.2d at 556. After the Rocky Ridge developer sold approximately half of the originally platted lots to homeowners, it platted numerous additional unsellable lots to itself, to ensure that it retained enough votes to unilaterally amend the declaration. Id. at 555. The developer then exercised its newly created voting power to adopt an amendment to the detriment of the other homeowners. Id. On appeal, this Court held that the developer's "procedure to amend the [original indenture] was nothing more than a poorly concocted voting sham," and that the developer breached its covenant of good faith and fair dealing by adopting the amendment. Id. at 556.

We agree that Bank's actions here are comparable to those in Rocky Ridge. The original Declaration provided Homeowners the significant benefit of self-governance of the Subdivision by establishing that only residents could hold office on the neighborhood association's board of directors. At its outset, the Declaration establishes:

> "it is the purpose and intention of this Declaration to create . . . a residential community . . . and to preserve the Property . . . and to protect the same against certain uses by the adoption of this Declaration, and to apply the general plan of development . . . [for] all [eighteen lots] . . . *for the mutual benefit* of the Declarant and all persons who may purchase, hold or own . . . the [lots]."

(emphasis added). It continues: "[t]he success of the Community is dependent upon the support and *participation of every Owner in its governance and administration* . . . [and]

20

the Association [is] the mechanism by which each Owner is able to provide . . . support and participation." (emphasis added). The Declaration ensured this participatory governance by specifying that the board of directors would consist entirely of residents of the Subdivision after the self-described "Period of Declarant Control" expired. When Homeowners purchased their homes and Bank subordinated its deeds of trust to the Declaration, all parties held a reasonable expectation that the neighborhood association would ultimately be governed by a board composed solely of the Subdivision's residents.

Yet, after Homeowners had already purchased and built their homes, Bank foreclosed upon the remaining lots in the Subdivision. As a consequence of this foreclosure, under the plain terms of the Declaration, Bank acquired majority voting power among the lot owners. Then, over Homeowners' objections, Bank exercised its newfound control to remove the residency requirement for board membership, as well as the requirement that ASC HOA's board be composed of directors "other than Declarant." Finally, Bank exploited its change to the Declaration to stock ASC HOA's board of directors with its own non-resident executives, who then rubber-stamped Bank's plan to develop the Subdivision with McKelvey.

Though it is correct, as Bank argues, that the Declaration provides it can be amended by the vote of 67% of lot owners, we do not believe that the original parties to the Declaration intended that a lot owner could unilaterally circumvent the requirement that those who actually reside in the Subdivision govern the Subdivision's affairs. Nor do we believe that Homeowners could reasonably have foreseen the instant turn of events.

Rather, Bank relied on its acquisition of majority voting power to unilaterally deny Homeowners the benefit of self-governance that they received under the original

Declaration. See Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc., 171 S.W.3d at 74 ("When a party, in bad faith, utilizes contract language that allows unilateral action to improperly deny the other party . . . expected benefits flowing from the contract, he breaches this covenant." (citing Koger, 28 S.W.3d at 412)).

At trial, Bank's president testified "our interests are different" than those of the Homeowners, and he acknowledged Bank's interests were "short term." He admitted that Bank understood it needed to control the board in order to approve the development plans it had already entered into with McKelvey. Later, he explained: "[t]he market has spoken . . . the market spoke that it wanted a different kind of home [in the Subdivision]."

By amending the Declaration to appoint its own non-resident executives as directors of ASC HOA's board, Bank seized upon "the express terms of agreement in such a manner as to evade the spirit of the transaction," Martin, 710 S.W.2d at 473, which plainly contemplated that Homeowners would have the right to chart their own course for the community in which they resided. Further, Bank used its command of the Subdivision's affairs to advance its own financial interest in redeveloping the Subdivision in a manner contrary to the wishes of the newly disenfranchised residents. Thus, we find Bank violated the implied covenant of good faith and fair dealing by amending the Declaration and removing the residency requirement for ASC HOA's board members so that it could appoint its own executives to the board. See Glenn, 360 S.W.3d at 879 (instructing that a party breaches covenant of good faith and fair dealing by violating spirit of agreement and denying other party expected benefit).

b. Bank and McKelvey's Response is Unpersuasive

22

Bank and McKelvey respond that the instant case is distinguishable from Rocky Ridge. Specifically, they argue that there was no violation of the implied covenant of good faith and fair dealing, because Bank, as the "Declarant," complied with the Declaration when it removed the residency requirements for directors and appointed its own executives by a vote of more than 67% of lot owners. Bank and McKelvey rely on a provision in the Declaration specifying that the Declarant, as well as its successors and assigns, have the authority to unilaterally appoint members to the homeowners' association's board of directors during the Period of Declarant Control, as defined by the Declaration.[19]

This argument mistakenly presupposes that Bank is the "Declarant," as defined in the Declaration. Here, Bank does not fit the Declaration's definition of "Declarant." The plain and unambiguous language of the Declaration defines "Declarant" narrowly to include the original Developer, and "its successors and assigns, if such successors or assigns should acquire more than one unimproved Lot from the Declarant *for the purpose of constructing a Dwelling Unit thereon*." (emphasis added).

Bank took possession of Developer's thirteen remaining unsold lots through foreclosure proceedings, which are typically instituted for the purpose of collecting payment on an underlying loan. See Howard v. Zweigart, 197 S.W. 46, 55 (Mo. banc 1917) (recognizing the validity of a foreclosure where the sole purpose was to collect on a debt); see also White v. Simard, 152 Md.App. 229, 252 (2003) ("[T]he exclusive purpose of a foreclosure sale is to timely and efficiently recoup the balance remaining on

---

[19] Prior to Bank's amendment, the Declaration specifically provided: "[e]xcept for Directors appointed by Declarant during the Period of Declarant Control . . . the Board shall consist of Owners other than the Declarant." It further stated: "[e]xcept for Directors appointed by Declarant . . . an Owner shall be a Member in Good Standing who is a resident of the Community."

the mortgage account."). Neither Bank nor McKelvey asserts that Bank acquired lots in the Subdivision "for the purpose" of constructing houses. To the contrary, Bank's president testified that after foreclosure, it immediately began exploring options to sell the lots to various developers for the purposes of recouping its losses, not to construct homes.[20] As there is no evidence that Bank "acquire[d] more than one unimproved Lot from the Declarant for the purpose of constructing a Dwelling Unit thereon," we cannot conclude that Bank is the "Declarant" with powers to unilaterally appoint directors to the neighborhood association.

In the alternative, Bank and McKelvey argue that Bank acted in good faith, because it explicitly followed the Declaration's procedures for adopting amendments when it voted to remove residency requirements. Homeowners, however, do not claim that Bank failed to follow the Declaration's voting procedures. Rather, Homeowners argue that what Bank did with its votes—amending the declaration to remove the residency requirement and packing the board with its own non-resident executives—violated the spirit of the Declaration, and therefore violated the covenant of good faith and fair dealing. As we have explained, Homeowners are correct that this action breached the covenant of good faith and fair dealing by stripping the Declaration of a substantial benefit it originally bestowed upon Homeowners. See Rocky Ridge, 993 S.W.2d 553, 556 (Mo. App. E.D. 1999).

*c. Point II Conclusion*

For the foregoing reasons, we find that Bank's amendment of the Declaration to remove the residency requirement violated the Declaration's implied covenant of good

---

[20] When asked how Bank wished to extricate itself from its ownership of the unsold lots, Bank's president testified: "It's no secret the bank would like to dispose of its foreclosed asset, right," as well as admitted, "we would like to sell the lots."

faith and fair dealing. Therefore, the trial court erred by denying Homeowners' Fourth Amended Petition Count I seeking declaratory and injunctive relief by finding ASC HOA's board of directors may validly be composed of Bank's non-resident employees. Furthermore, because the current board of directors of ASC HOA was wrongly comprised of non-resident Bank employees, all of the board's subsequent actions are null and void. See Rocky Ridge, 993 S.W.2d at 556 (holding "product" of voting action that violated the covenant of good faith and fair dealing was invalid). We therefore reverse and remand Count I with instructions that the trial court enter a judgment declaring the rights and obligations of the parties and granting injunctive relief in a manner consistent with this opinion. Point granted.

### 3. Homeowners' Points III – IV ASC HOA's Approval of Development Plans

Homeowners contend in Points III and IV that the trial court erred in denying them injunctive relief and granting declaratory judgment in favor of Bank because: (1) ASC HOA's board "did not act reasonably or in good faith in approving McKelvey's plans" for the Lot 13 Home; and (2) the designs of the Lot 13 Home, which the Board approved, and future homes planned by McKelvey violate the Declaration's architectural covenants.

As we have already explained above in Point II, Homeowners are entitled to injunctive and declaratory relief consistent with our finding that ASC HOA's board was and is improperly composed of Bank's employees, and that its subsequent actions are null and void. Consequently, the board's actions: (1) approving the Lot 13 Home and future homes and (2) its decisions regarding compliance with the Declaration's architectural covenants should be declared null and void. We do not decide Homeowners' claims

concerning whether the Lot 13 Home, or Bank and McKelvey's future home designs violate the Declaration's architectural covenants, because these issues must be revisited by a properly constituted ASC HOA board of directors. We therefore reverse and remand the issues presented in Homeowners' Points III and IV for further proceedings consistent with this opinion. Points III and IV are therefore granted to the extent we find the court erred in denying Homeowners request for declaratory and injunctive relief.

### 4. Homeowners' Point V – Maintenance Costs for Subdivision

In their fifth point, Homeowners contend the trial court erred in granting Bank's motion for reimbursement of maintenance costs it purportedly incurred on behalf of ASC HOA's board, because Bank failed to present any competent evidence of the costs or comply with the procedures of the Declaration when it incurred these costs. Again, because we find that the board's action approving such expenditures, ab initio, is null and void, we reverse the court's order requiring Homeowners to reimburse Bank for such expenditures. Whether to ratify any or all of the decisions of the former ASC HOA's improperly constituted board regarding maintenance expenses, and how such expenses might be divided among lot owners, is an issue that first should be addressed by a properly constituted board. The trial court must enter findings in a manner consistent with this opinion. We therefore reverse and remand Point V for further proceedings. Point granted, insofar as we agree the court erred in awarding Bank such costs.

### 4. Homeowners' Point VI – Damages

In their sixth point, Homeowners contend that the court erred in granting judgment in favor of Bank and McKelvey on Homeowners' additional claims for damages caused by the actions of the improperly constituted ASC HOA. In addition to

Homeowners' Count I, which sought declaratory and injunctive relief, Homeowners' petition included causes of action seeking damages under: Count II, alleging breach of fiduciary duty; Count III, alleging civil conspiracy; Count IV, alleging tortious interference; and Count V, alleging nuisance. Homeowners request that we reverse and order an evidentiary hearing with respect to these claims. Respondents argue there was no violation of the Declaration's covenants by Defendants, so the trial court did not err in dismissing Homeowners' remaining damages claims.

The trial court, in its December 20, 2012 "Findings of Fact and Conclusions of Law on Plaintiff's Request for a Permanent Injunction" stated that Bank's non-resident employees may validly serve on ASC HOA's board of directors and denied Homeowners' Count I for declaratory and injunctive relief, primarily on this ground. Because the December 20, 2012 Findings did not address Homeowners' remaining counts II through V, the parties requested clarification. In response, the court entered a "Final Judgment" on January 22, 2013, incorporating its earlier finding that ASC HOA's board was properly composed of Bank's non-resident employees, and decreeing that: "consistent with the Court's Findings of Fact and Conclusions of Law of December 20, 2012 . . . Final Judgment is entered in favor of Defendants . . . and against [Homeowners] . . . jointly and severally on all Counts . . ." It is evident that the trial court, in denying all of Homeowners' Counts I through V, based its Final Judgment on the erroneous conclusion that ASC HOA's board was validly composed of Bank's non-resident employees. Therefore, Counts II through V alleging damages must also be remanded to the trial court with instructions that it conduct further proceedings. The trial court is in the best position to determine Homeowners' claims for damages, and whether

27

further proceedings are necessary. See Emery v. Wal-Mart Stores, Inc., 976 S.W.2d 439, 448 (Mo. banc 1998) (recognizing issue of damages is generally for the finder of fact, who is in a superior position to evaluate allegations of harm).

In conclusion, with respect to Homeowners' claims, we reverse the trial court's judgment regarding: Count II, alleging Bank's breach of fiduciary duty; Count III, alleging McKelvey and Bank's civil conspiracy; Count IV, alleging McKelvey and Bank's tortious interference; and Count V, alleging nuisance against McKelvey and Bank. We remand for further proceedings consistent with this opinion. Point granted.

## B. BANK'S COUNTERCLAIMS

### 1. Slander of Title

In its first point on cross-appeal, Bank argues that the trial court erred by granting Homeowners' motion for summary judgment on Bank's counterclaim for slander of title, because there were disputed issues of material fact regarding whether Homeowners' filing of a notice of lis pendens was unauthorized by law. In response, Homeowners contend that this Court has already decided that the lis pendens is authorized as a matter of law and therefore, Bank cannot prove all of the essential elements of its slander of title claim. Homeowners are correct.

A "defending party" may establish a right to summary judgment by showing as a matter of law that the plaintiff cannot establish an essential element of its claim. See ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 381 (Mo. banc 1993). Slander of title has three essential elements: (1) false words concerning title to property; (2) malice in the publication of such; and (3) injury to the party whose title was slandered. Tongay v. Franklin Cnty. Mercantile Bank, 735 S.W.2d 766, 770 (Mo.

28

App. E.D. 1987). Only if the filing of a lis pendens is unauthorized by statute, does it meet the "false words" requirement for a slander of title action. First Nat'l Bank of St. Louis v. Ricon, Inc., 311 S.W.3d 857, 865 (Mo. App. E.D. 2010). Additionally, to prove the existence of malice, Bank's evidence must support a reasonable inference that Homeowners' lis pendens was, inter alia, filed "without legal justification or excuse." Id. at 867.

Here, Bank's claim for slander of title fails as a matter of law because in the writ of prohibition sought by Homeowners during the pendency of this appeal, this Court already determined that Homeowners' filing of the lis pendens was authorized by statute.[21] See State ex rel. Lemley v. Hon. Gloria C. Reno, No. ED 99612, 2013 WL 1209615, at *2-3 (Mo. App. E.D. Mar. 26, 2013) (rejecting Bank's argument regarding unlawfulness of lis pendens when Bank raised issue in response to writ filed by Homeowners). Specifically, this Court held:

> Section 527.260 provides [Homeowners] the unqualified right to record a lis pendens '[i]n any civil action, based on any equitable right, claim or lien, affecting or designed to affect real estate.' [Homeowners] action concerns the enforcement of certain covenants and restrictions that affect the owners' interest in the land. Accordingly, [Homeowners] properly exercised their rights under Section 527.260 when they initially recorded the lis pendens at issue.

Id. at *2 (citations omitted).

"Unless there is a change in the issues or the evidence, the court of appeals' previous holding constitutes the law of the case and concludes any issues decided." Gamble v. Hoffman, 732 S.W.2d 890, 895 (Mo. banc 1987). "The doctrine of the law of the case permits a decision on an issue of law made at one stage of a case to become

---

[21] Homeowners petitioned for a writ of prohibition, arguing that the trial court exceeded its authority when it ordered them to release their lis pendens during the pendency of this appeal.

binding in successive stages of the same litigation." <u>Pathway Fin. v. Schade</u>, 793 S.W.2d 464, 469 (Mo. App. E.D. 1990). The doctrine of law of the case is not absolute, however, it applies as a rule of policy unless the first decision was based on a mistaken fact, resulted in manifest injustice, a change in the law intervened between the appeals, or where the issues or evidence on remand are substantially different from those vital to the first adjudication and judgment. <u>Walton v. City of Berkeley</u>, 223 S.W.3d 126, 130 (Mo. banc 2007).

Although Homeowners' writ of prohibition sought a decision on a peripheral issue, this Court determined, in this case, that as a matter of law Homeowners' recordation of the lis pendens was valid under section 527.260. <u>Lemley</u>, 2013 WL 1209615, at *2-3. Because this Court's previous holding on this issue relied on the same evidence and arguments, yet our holding did not result from a mistaken fact, there has been no change in the law, and it did not result in a manifest injustice, we apply the doctrine of law of the case and find that Bank fails, as a matter of law, to establish the essential elements of "false words" or "malice" for its slander of title claim. <u>See</u> <u>First Nat'l Bank</u>, 311 S.W.3d at 864 ("Parties have an absolute privilege to disparage another's property interest when participating in a judicial proceeding if the disparagement has some relation to the judicial proceeding."). Accordingly, the trial court did not err in granting Homeowners' motion for summary judgment on Bank's counterclaim for slander of title. Point denied.

### 2. Abuse of Process

In its second point on cross-appeal, Bank contends the trial court erred by granting Homeowners' motion for summary judgment on Bank's counterclaim for abuse

of process, because there is a genuine issue of material fact regarding whether Homeowners filed the instant lawsuit to undermine Bank's ability to sell its properties in the Subdivision. Specifically, Bank contends that Homeowners instituted this action in order to cloud title to Bank's lots with a lis pendens, not to obtain the relief that they now seek on appeal. In response, Homeowners assert that Bank has produced no evidence to establish that they acted illegally or with improper motive. We agree with Homeowners.

Again, a "defending party" may establish a right to summary judgment by showing as a matter of law that the plaintiff cannot establish an essential element of its claim. See ITT Commercial Fin. Corp., 854 S.W.2d at 381. "To sustain a claim for abuse of process there must be [1] an illegal and unauthorized use of process, [2] an ulterior motive for the use of such process, and [3] resulting damages." Wessler v. Wessler, 610 S.W.2d 650, 651 (Mo. App. E.D. 1980). The essence of an abuse of process claim is not the commencement of an action without justification, but rather the misuse of process to accomplish an unlawful end or "compel the opposite party to do some collateral thing which he could not be compelled to do legally." Duvall v. Lawrence, 86 S.W.3d 74, 85 (Mo. App. E.D. 2002). Even if the defendant had a bad motive, a claim for abuse of process does not lie where the defendant's use of legal process was within her legal rights or if she has "done nothing more than pursue a lawsuit to its authorized conclusion." Pipefitters Health & Welfare Trust v. Waldo R., Inc., 760 S.W.2d 196, 198 (Mo. App. E.D. 1988); Herring v. Behlmann, 734 S.W.2d 311, 313-314 (Mo. App. E.D. 1987).

Here, Homeowners pursued the instant action to accomplish a lawful end. They sought injunctive relief and declaratory judgment on the grounds that Bank improperly amended the Declaration to remove the residency requirement, and elected its own non-

31

resident employees as officers, who then rubber-stamped approval of Bank and McKelvey's plans for redevelopment of the Subdivision. Moreover, this Court held that Homeowners' action in filing the lis pendens was entirely legitimate. Lemley, 2013 WL 1209615, at *2-3 (holding homeowners' lis pendens was lawful). Accordingly, the trial court did not err in granting Homeowners' motion for summary judgment on Bank's counterclaim for abuse of process, because Bank failed as a matter of law to establish the essential "illegal and unauthorized use of process" element for its abuse of process claim. Pipefitters Health & Welfare Trust, 760 S.W.2d at 198 (explaining abuse of process claim fails where defendant's action is within its legal rights); Wessler, 610 S.W.2d at 651 (explaining plaintiff must establish element of "an illegal and unauthorized use of process" in abuse of process claim). Point denied.

## V. CONCLUSION

We affirm the trial court's grant of Homeowners' motions for summary judgment on Bank's counterclaims of slander of title and abuse of process. We also affirm the trial court's grant of partial summary judgment in favor of Bank on Bank's claim that ASC HOA has the authority to govern the Subdivision. However, we reverse the trial court's judgment with respect to Count I denying Homeowners' claims for declaratory and injunctive relief, and granting Bank declaratory relief, on Homeowners' claim that ASC HOA's board was improperly composed of Bank's non-resident employees. We hold that Bank violated the Declaration's implied covenant of good faith and fair dealing by amending the Declaration to eliminate the residency requirement and then electing its non-resident executives to the board. We reverse and remand to the trial court Homeowners' Count I with instructions that it enter declaratory judgment in favor of

32

Homeowners, and grant their request for appropriate permanent injunctive relief in a manner consistent with this opinion. Homeowners' remaining claims for damages in Counts II, III, IV and V of their Fourth Amended Petition are also remanded for further proceedings consistent with this opinion.

_____
Lisa S. Van Amburg, Presiding Judge


Patricia L. Cohen, J. concurs and
Gary M. Gaertner, Jr., J. dissents in a separate opinion.



# In the Missouri Court of Appeals

# Eastern District

| | | |
|---|---|---|
| THE ARBORS AT SUGAR CREEK, | ) | ED99730 |
| HOMEOWNERS ASSOCIATION, INC., | ) | |
| ET AL., | ) | |
| Plaintiffs/Appellants, | ) | |
| | ) | |
| v. | ) | |
| JEFFERSON BANK & TRUST | ) | Appeal from the Circuit Court |
| COMPANY, INC., | ) | of St. Louis County |
| Defendant/Respondent/Cross-Appellant, | ) | |
| | ) | |
| v. | ) | Honorable Gloria Clark Reno |
| | ) | |
| AND | ) | |
| MCKELVEY HOMES, LLC., | ) | Filed: October 28, 2014 |
| Defendant/Respondent, | ) | |

## DISSENT

This case exemplifies what happened in general to real estate development and the banking industry following the 2008 economic collapse. The developer of an 18-lot subdivision of homes valued at up to $1,800,000 took out a $4,900,000 loan from Jefferson Bank & Trust Company, Inc. (Bank) in February of 2006. The developer built and sold five exquisite homes, but the developer ran headlong into the economic maelstrom of 2008. In 2009, after not having

sold another lot for over a year, the developer defaulted on its loan, then valued at over $3,900,000, and the Bank foreclosed on the 13 remaining lots in this subdivision in March of 2010. The Bank, who answers to and is regulated by the FDIC and the Federal Reserve Bank, attempted to salvage its losses on this loan, which was underwater and deficient in the amount of over $1,250,000, by contracting with McKelvey Homes, Inc. (McKelvey) to build homes on the remaining 13 lots in the range of value of upwards of $900,000. The Bank president testified that the real estate market had drastically changed as the original developer had only sold five homes in five years, and not one home had sold in the past year prior to foreclosure, but McKelvey had 8 contracts within 6 months of contracting with the Bank in 2010.

The original homeowners filed suit against the Bank, alleging that the new McKelvey homes in essence are not architecturally in compliance with the subdivision covenants. I do agree with the original homeowners that the McKelvey homes are not the exact same architecturally as the original five homes, but I cannot say with a straight face that a $700,000 to $900,000 home is a shanty either, compared to homes in the $1,300,000 to $1,800,000 range. The housing market changed, and ultimately one party here had to lose something: the Bank its money, or the homeowners their architectural perfection.

I do not agree with the majority's characterization of the Bank's acts as violating the implied covenant of good faith and fair dealing when juxtaposed against the real estate collapse from 2008-2012 and the regulatory pressure of the FDIC and Federal Reserve Bank on banks in general to deal with non-performing real estate loans, and in particular a bank's capitalization ratio. There was no easy solution for the Bank to extricate itself from this non-performing loan on The Arbors' 13 lots, while simultaneously perfecting the oasis the original subdivision lot owners architectually desired. Among other things, the Bank to its credit refused to sell

individual lots that would have brought more money to the Bank, but would have destroyed any architectural consistency of the subdivision; obtained independent architectural review of McKelvey's plan; requested one of the five homeowners to sit with the two Bank executives on the three-person homeowners' association; and attempted to work with the homeowners.

The crux of my complaint with the majority opinion is that it fails to take into account business reality and the economic collapse in real estate development and real estate in general that occurred between 2008 through 2012 in the United States, and St. Louis in particular, in viewing the actions of the Bank. I therefore concur with the majority opinion as to Appellant's Point I, the authority of ASC HOA to govern the subdivision, and as to Respondent's counterclaim point one, slander of title, and point two, abuse of powers. I dissent from the rest of the majority's opinion as to Appellant's Points II, III, IV, V, and VI.

In light of the majority's opinion, banks and developers are well-advised to properly address and make known in all future subdivision indentures/declaration of covenants, conditions, and restrictions, what banks and subsequent developers are permitted to do upon foreclosure and subsequent redevelopment of a subdivision after failure of the original developer, when future economic calamities again undoubtedly occur.

_____
Gary M. Gaertner, Jr., Judge